JOEL HAGLER AND IRENE HAGLER, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 8087-81, 22334-82,     Filed April 3, 1986.
2813-83, 15159-83.

*Jerome Kamerman* and *Steven Kamerman*, for the petitioners.

*Alan J. Kaufman* and *Jody Tancer*, for the respondent.

---

[1] Cases of the following petitioners are consolidated herewith: Frederick M. Dahlmeier and Jane G. Dahlmeier, docket No. 22334-82; and Thomas C. Mullen and Joann Mullen, docket Nos. 2813-83 and 15159-83.

SWIFT, *Judge*: In timely statutory notices of deficiency, respondent determined deficiencies in petitioners' Federal income tax liabilities as follows:

| Petitioners | Years | Deficiencies |
|---|---|---|
| Joel Hagler and | 1977 | $2,621.00 |
| Irene Hagler | 1978 | 4,624.00 |
| Frederick M. Dahlmeier and | 1977 | 18,273.62 |
| Jane G. Dahlmeier | 1978 | 12,251.40 |
| | 1979 | 6,968.96 |
| Thomas C. Mullen and | 1977 | 15,330.66 |
| Joann Mullen | 1978 | 12,760.56 |
| | 1979 | 8,648.16 |

These cases were consolidated by order of the Court dated March 23, 1983. The Federal income tax deficiencies in dispute herein relate to partnership losses arising from petitioners' investments in a limited partnership by the name of "Reportco". The primary issues for decision are: (1) Whether a $1,200,000 nonrecourse promissory note signed on December 31, 1976, was a genuine debt on that day; (2) whether amounts paid and accrued as interest on nonrecourse promissory notes constituted interest with respect to genuine indebtedness; and (3) whether activities of the partnership with respect to a license of a computer program and research and development to enhance the computer program constituted a trade or business or an activity entered into for profit.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. At the time of filing their petitions in this case, petitioners Joel and Irene Hagler were husband and wife and resided in Los Angeles, California; petitioners Frederick M. and Jane G. Dahlmeier were husband and wife and resided in Riviera Beach, Florida; and petitioners Thomas C. and Joann Mullen were husband and wife and resided in Woodbury, New York. Petitioners timely filed joint Federal income tax returns for the years in issue.

### *Formation of Reportco*

Reportco is a Connecticut limited partnership which was formed on June 25, 1975. The original name for the

partnership was Phoenix Associates XIV. At the time the partnership was formed, the sole general partner of Reportco was Phoenix Resources, Inc. (Phoenix Resources), and the sole limited partner of Reportco was Carl Paffendorf (Paffendorf). Originally, the profits, losses, and distributions of Reportco were allocated 95 percent to Paffendorf as the sole limited partner. The original allocation of the remaining 5 percent of Reportco's profits, losses, and distributions is not established in the record herein. The stated purpose of Reportco was to engage in the business of real estate development and sales.

The stock of Phoenix Resources was owned 80 percent by Vanguard Ventures, Inc. (Vanguard Ventures). The ownership of the remaining 20 percent of the stock of Phoenix Resources is not established in the record herein. The president of Phoenix Resources was Burton Kassell, and the secretary and chairman of the board of directors was Mr. Paffendorf.

The stock of Vanguard Ventures was owned 88 percent by Paffendorf. The ownership of the remaining 12 percent of the stock of Vanguard Ventures is not established in the record. Paffendorf was the secretary and chairman of the board of directors of Vanguard Ventures. Vanguard Ventures was in the business of promoting tax shelters.

### The License Agreement and the Nonrecourse Promissory Note

The partnership losses at issue herein arose in the context of certain agreements that Reportco entered into with Digitax, Inc. (Digitax) and Hi-Tech Research, Inc. (Hi-Tech), both of which were corporations that were wholly owned subsidiaries of COAP Systems, Inc. (COAP). COAP was a publicly traded corporation of which Paffendorf was president, chairman of the board of directors, and controlling shareholder.[2] Vanguard Ventures also was a shareholder of COAP.[3]

---

[2] In 1977, Paffendorf was the record and beneficial owner of 18 percent of COAP's outstanding common stock. Paffendorf's ownership of COAP's common stock in 1978 increased to 41.5 percent and, in 1979, to 72.3 percent.

[3] In 1977, Vanguard Ventures was the record owner of 5 percent of COAP's outstanding common stock. Vanguard Ventures' ownership of COAP's common stock rose to 16 percent in 1978 and 1979. As a result of Paffendorf's control of Vanguard Ventures and of his direct

Digitax was engaged in the business of preparing individual Federal and State income tax returns. Between 1973 and 1976, petitioner Joel Hagler (Hagler), a certified public accountant, and Robert Keane (Keane), a computer programmer, were employed by COAP to develop and maintain computer programs and computer systems used by Digitax.

Digitax offered a computerized remote batch processing income tax service; that is, tax return preparers would send client tax information to Digitax on computer input forms. Digitax would process the information on its mainframe computer, after which completed returns would be mailed to the preparers. By 1976, Digitax had established a reputation and a national clientele. It had begun marketing its computerized income tax return preparation service in 1969 and prepared about 17,000 income tax returns in that year. Also in that year, Digitax entered into a marketing agreement with Prentice-Hall, Inc., under which Prentice-Hall agreed to sell the Digitax tax return preparation service. By 1976, Digitax had become one of the 12 leading computerized income tax return preparation services in the United States.

In the fall of 1976, Paffendorf concluded that the Digitax computer program for the preparation of tax returns could be modified and thereafter the program itself could be sold or licensed to accountants and tax return preparers who then could use the modified program on their own minicomputers in their own offices.[4] The possibility of offering accountants and tax return preparers a product that would enable them to process tax returns on their own computers and in their own offices was regarded by Paffendorf as a potentially profitable business opportunity. Paffendorf approached Hagler and Keane about his idea. The three individuals agreed that the idea was feasible and potentially lucrative. Paffendorf agreed to be responsible for finding investors for the project.

Paffendorf decided to use Reportco (then Phoenix Associates XIV) as the partnership through which funds for the project would be raised. He also decided that Reportco

ownership, indicated above, of COAP's stock, Paffendorf controlled more than 50 percent of the stock of COAP in both 1978 and 1979.

[4] In the context of this case, a "minicomputer" is defined by the parties as any computer that sells for less than $100,000.

would acquire from Digitax a license to use Digitax's existing computer program for the preparation of tax returns.

Paffendorf did not pursue the project further until the afternoon of December 31, 1976, when he was reminded that contracts entered into after December 31, 1976, would be subject to a substantial change in the Federal tax laws that would limit the extent to which losses would be available with respect to nonrecourse indebtedness. Paffendorf, therefore, sometime in the late afternoon or early evening of December 31, 1976, wrote a handwritten document (hereinafter referred to as the license agreement), in which it was stated that Digitax licensed to Reportco its computer program for the preparation of income tax returns for $1,500,050.

The amount due under the license agreement was to be paid by Reportco in the following manner: $50 cash upon signing, $300,000 cash due on or before May 31, 1977, and a $1,200,000 nonrecourse promissory note. Paffendorf alone established the terms and consideration set forth in the handwritten license agreement. No independent appraisal of the value of the Digitax computer program, or of a license thereof, was obtained by Paffendorf until September of 1977, and no arm's-length negotiations took place between representatives of Reportco and Digitax. The exact language of the handwritten license agreement is set forth below:

### LICENSE AGREEMENT

DATED: 12/31/76

Agreement made as of the 31st day of December, 1976 by & between Digitax, Inc of Albertson, NY ("Dig") and [Reportco] a Conn. limited partnership ("ptnshp").

WHEREAS, Dig has a large scale remote processing federal 1040 income tax computer program and the state and city programs as described in Exhibit A; and

Ptnshp, wishes to develope [sic] a minicomputer tax system for use within the tax preparer's office on a relatively low volume per installation basis.

NOW, THEREFORE, in consideration of these premises, it is agreed:

(l) *License* - Dig hereby licenses Ptnshp to make a copy of its 1040 programs as described in Exhibit A by transferring the information from Dig tapes to ptnshp tapes and use said information ("system") in developing a minicomputer tax system for use w/i the individual tax

preparer's office. Minicomputer shall be any computer selling for less than $100,000 new at current comparative rates.

(2) *Term* - The term of this license shall be until Dec. 15, 2015.

(3) *Consideration* - Ptnshp agrees to pay Dig $1,500,050, $300,000 in cash on or before May 31, 1977, $50.00 with the signing of this agreement and $1,200,000 by promissory note bearing interest at the rate of 6% per annum in accordance w/ the sched contained in said note, a copy of which is annexed as Exhibit B hereto (the "note").

(4) *Improvements* - Ptnshp shall be entitled to any improvements to the System made by Dig for a period of 5 years from the date hereof w/o further charge.

(5) *Indemnification* - Dig shall indemnify and save harmless the ptnshp from any claim &/or judgment against ptnshp based upon an alleged illegal use of the System.

(6) *Warranties* - Dig warrants that it has sole title to the System, that it is substantially error free and produces the forms, schedules, & returns listed in Exhibit A.

Dig further represents that it has full right and authority to enter into this agreement.

(7) *Termination* - In the event that any installment of principle [sic] or interest on the note annexed hereto as Exhibit B is not paid w/i 30 days after due, all rights hereunder conveyed to ptnshp by Dig under this agrmt shall upon 10 days written notice from Dig to ptnshp revert to Dig.

(8) *Notices* - Notices to Dig to be mailed certified mail to:

175 I. U. Willets Rd, Albertson, NY;

and to Ptnshp to:

21 Albertson Ave, Albertson, NY.

(9) This agreement shall be governed by and construed in accordance w/ the laws of the State of NY.

(10) This agreement may not be modified or amended except in writing signed by the parties hereto.

(11) This agrmt shall be binding upon and innure [sic] to the benefit of the parties hereto, their successors and assigns.

In WITNESS WHEREOF, the parties hereto have signed this agreement as of the date first written above.

| Digitax, Inc. | Phoenix Associates XIV |
|---|---|
| (S) | (S) |
| By Morton L. Tartar, Pres. | By Bruce Ridulfo - Sec. of TMC GENERAL PARTNER |

At the same time on December 13, 1976, as the license agreement was signed, Paffendorf prepared the $1,200,000 nonrecourse promissory note that was called for under the license agreement. Payments of principal under the note

were due in six annual installments beginning December 31, 1980. Payments of simple interest at 6 percent per year were due once each year beginning on December 31, 1977, but the annual interest payments due in 1977, 1978, 1979, and 1980 could be deferred entirely until December 31, 1981, at the election of Reportco.

As collateral for the $1,200,000 nonrecourse promissory note, Reportco granted to Digitax a security interest in the Digitax computer program (which program Digitax already owned) and in all income tax systems for minicomputers developed by Reportco thereafter. The $1,200,000 promissory note was nonrecourse as to each of the general and limited partners of Reportco and also as to Reportco, itself. Although the record is not completely clear on this point, the $300,000 deferred cash obligation also apparently was nonrecourse as to each of the general and limited partners and also as to Reportco, itself.

Only two individuals were in the office with Paffendorf on the afternoon of December 31, 1976, when the promissory note and license agreement were signed, namely, Morton Tartar (Tartar), the president of Digitax, and Bruce Ridulfo (Ridulfo), the bookkeeper of Vanguard Ventures. Ridulfo also was a full-time college student.

Paffendorf instructed Tartar and Ridulfo to sign the license agreement on behalf of Digitax and Reportco, respectively. Paffendorf also directed Ridulfo to sign the $1,200,000 promissory note on behalf of Reportco. Tartar had authority to contractually bind Digitax. Ridulfo, however, was merely a clerical employee of Vanguard Ventures, the parent of Phoenix Resources, which was the general partner of Reportco. Ridulfo did not have authority to execute either the license agreement or the promissory note on behalf of Reportco.

Later on the evening of December 13, 1976, Paffendorf issued on behalf of Reportco a $50 check to Digitax and had the license agreement and the promissory note notarized.

We reiterate that as of December 31, 1976, Reportco was a "shelf" partnership of which Paffendorf was the sole limited partner, and of which Phoenix Resources (which Paffendorf controlled through his ownership of stock in

Vanguard Ventures) was the sole general partner. The licensor, Digitax, also was controlled by Paffendorf through his controlling interest in its parent corporation, COAP.

Sometime in 1977, the license agreement and the $1,200,000 nonrecourse promissory note of Reportco were typewritten under Paffendorf's direction. The typewritten promissory note was signed by Burton Kassell, the president of both Phoenix Resources and Vanguard Ventures, on behalf of Phoenix Resources as the general partner of Reportco. The typewritten copy of the license agreement was never signed by either Digitax or Reportco.

On May 25, 1977, Hagler and Keane became general partners of Reportco. Hagler and Keane each issued to Reportco recourse promissory notes in their individual capacities in the amounts of $17,000. The notes bore simple interest at a rate of 8.5 percent per year. Interest and principal payments on the notes are not due until March 31, 1987.

On June 6, 1977, Paffendorf wrote a letter to Vanguard Ventures in which he, on behalf of Digitax, purported to recharacterize the license agreement between Digitax and Reportco as a sale, rather than a license of the computer program as it was characterized in the original license agreement. Although written by Paffendorf, the letter was signed by Joshua D'Avanzo, vice-president of Digitax, and by Burton Kassell, president of Vanguard Ventures, to indicate the apparent agreement of Vanguard Ventures and Reportco to the recharacterization of the license agreement. Although the label to be used by the parties for the agreement changed, we note that none of the underlying terms of the original license agreement were changed. On June 10, 1977, Reportco paid Digitax the $300,000 that was due on May 31, 1977, under the terms of the license agreement, plus cash in the amount of $7,500 that allegedly represented interest on the deferred cash payment.

During the spring of 1977, a confidential memorandum was prepared and was given to prospective investors in Reportco. The confidential memorandum cautioned that due to the interrelationships of the Paffendorf-controlled entities involved with Reportco, there was a lack of arm's-length dealing between the various entities involved with the

conversion of Digitax's computer program for use by minicomputers and with the marketing thereof. Some general gross revenue figures from the sale of minicomputers and from the sale or licensing of the accompanying software for tax return preparation were included in the confidential memorandum. The memorandum stated that the limited partners could expect substantial tax benefits to flow from partnership deductions, and a detailed projection illustrating after-tax cash benefits to the investors and taxable losses of the partnership was made in the memorandum.

Petitioners Frederick M. Dahlmeier (Dahlmeier) and Thomas C. Mullen (Mullen) became limited partners of Reportco in August of 1977, and each contributed to the partnership $10,000 cash, a $10,000 recourse promissory note due in 1978, and a $3,000 recourse promissory note due in 1979.

Reportco's limited partnership agreement was amended in August of 1977 to reflect that Reportco would be engaged in the computer software business, that Phoenix Resources, its managing general partner, would receive $36,000 a year as a management fee, that a total of 25 limited partners (including Dahlmeier and Mullen) had invested in the partnership, and that the allocation of profits, losses, and distributions of the partnership would be as follows:

Paffendorf—as a limited partner.....................1%
Phoenix Resources—as a general partner.............1%
Hagler—as a general partner .......................2%
Keane—as a general partner........................2%
Other limited partners ...........................94%

### The Research and Development Agreement

On May 26, 1977, Reportco entered into a research and development agreement (hereinafter referred to as the R & D agreement) with Hi-Tech under which Hi-Tech for a consideration of $1,300,000 agreed to convert Digitax's computer programs for the preparation of income tax returns and for the maintenance of a general ledger accounting system so that those programs could be used on minicomputers. The $1,300,000 was to be paid to Hi-Tech by Reportco in the following manner: $100,000 cash on or before December 31, 1977, $100,000 cash and a $400,000 nonrecourse promissory

note at the completion of stage one of the project, $100,000 cash and a $400,000 nonrecourse promissory note at the completion of stage two of the project, and a $200,000 nonrecourse promissory note at the completion of the project.

After the promissory notes were issued, payments of simple interest at 6 percent per year were to be made once a year beginning December 31, 1978, but the annual interest payments on the promissory notes due in 1978, 1979, 1980, and 1981 could be deferred entirely until December 31, 1982, at the election of Reportco. Issuance of the three promissory notes and payments of principal due thereunder were dependent upon Hi-Tech's actually completing the work to be done under each stage of the R & D agreement.

The R & D agreement also provided that an inspection by an independent auditor was to be conducted at the completion of each stage of the R & D agreement to verify whether Hi-Tech had successfully completed the work required under the agreement on the dates specified. Hi-Tech was a wholly owned subsidiary of COAP, and Hi-Tech received its operating revenues primarily from the sale of research and development services to limited partnerships of which Vanguard Ventures, or its subsidiaries, was a general partner.

Paffendorf alone represented both Reportco and Hi-Tech in establishing the terms of and consideration for the R & D agreement. No independent appraisal was made at the time the R & D agreement was entered into of the value of the research and development to be performed by Hi-Tech for Reportco. Reportco did not receive bids from, nor did it consider using, any other research and development company to perform the research necessary to convert the Digitax computer program.

The R & D agreement provided that work on the Reportco project was to be completed by Hi-Tech in three stages: (1) Development of the minicomputer programs, systems, and technology for maintenance of a general ledger accounting system and for the preparation of Federal income tax returns (to be completed on or before December 31, 1977); (2) updating and maintaining minicomputer programs for

the general ledger and tax return preparation system and the development of an additional program for the preparation of certain Sate income tax returns (to be completed on or before December 31, 1978); and (3) updating and improving all programs and systems developed under stages one and two and completion of programs for the preparation of additional State and municipal income tax returns (to be completed on or before December 31, 1979).

In June of 1977, Hagler and Keane were employed by COAP, the parent of Hi-Tech, at annual salaries of $30,000, to perform the research and development contemplated under the R & D agreement. Reportco rented an office in July of 1977 in Los Angeles, California, and also purchased office furniture for use in that office at a cost of $993. In August of 1977, research on the Reportco project actually commenced when Digitax delivered a copy of its computer program to Reportco and Reportco purchased one minicomputer. At that time, Hi-Tech also hired one computer programmer and a secretary to assist Hagler and Keane. Hagler and Keane and the other two employees of Hi-Tech worked at Reportco's office in Los Angeles and used Reportco's computer equipment.

Reportco made payments to Hi-Tech under the terms of the R & D agreement in the amounts of $15,000 in September of 1977 and $85,000 in October of 1977. Upon delivery of the Digitax computer program to Reportco in August of 1977, Hagler and Keane concentrated their efforts on the development of the minicomputer program for the general ledger accounting system because they did not believe they could complete the development of the tax return program by January 1, 1978, the latest day that program would have to be available if it was to be marketed during the 1978 tax return preparation season. They had made substantial progress on the general ledger program by late 1977.

Even though Hagler and Keane had completed very little work on the tax return program by the end of 1977, Reportco received a certification in December of 1977 that work on both the general ledger and the tax return programs had been completed by Hi-Tech in a satisfactory manner. Therefore, on December 31, 1977, Reportco issued a $400,000 nonrecourse promissory note to Hi-Tech. Pay-

ments of simple interest at 6 percent on the $400,000 note were due beginning in 1978 but could be deferred until 1982. Annual payments of principal were due beginning in 1980, and the full principal and interest due under the note were due on December 31, 1987. As collateral for the promissory note, Reportco granted to Hi-Tech a security interest in the minicomputer program, which security interest was subordinate to the interest previously granted therein to Digitax in conjunction with the license agreement.

In January of 1978, Keane, on behalf of Reportco, began to direct his programming efforts toward development of a customized general ledger accounting system for one specific company, Sonic Air Courier, Inc. (Sonic). Hagler wanted Keane to continue working on the tax return preparation program for Reportco, but Paffendorf agreed with Keane that the project for Sonic should have priority. By February of 1978, all work on the Reportco tax return program had ceased and Hagler had resigned his position with Hi-Tech but continued working for Digitax on matters unrelated to the research and development work for Reportco. Hagler also at that time converted his general partnership interest in Reportco to a limited partnership interest.

In June of 1978, Reportco sold to Sonic the one minicomputer it owned and the computerized accounting system developed by Keane. In payment therefor, Reportco received from Sonic $30,000 in cash and the right to demonstrate the accounting program installed at Sonic to potential customers in the air freight industry. Thereafter, Reportco paid Hi-Tech $25,000 in partial payment of the $100,000 that was due at the end of stage one of the R & D agreement. Some demonstrations were made by Hi-Tech employees of the accounting program installed at Sonic, but no other sales were made of that accounting program apparently because comparable computerized general ledger accounting systems were available elsewhere for a lower price.

It appears that no further work on the Reportco research and development project was undertaken by Keane or the programmer at Hi-Tech after Reportco sold its only mini-

computer to Sonic. In a letter dated September 5, 1978, however, Paffendorf suggested that Keane "should press ahead with a tax program to the best of [his] ability in order to protect the partnership deductions."

In spite of the lack of progress on the research and development project relating to the preparation of tax returns with minicomputers, in December of 1978, Soloman Manber (Manber) certified to Reportco that Hi-Tech had completed the research and development required under stage two of the R & D agreement. Manber was a long-time friend of Paffendorf and a director and shareholder of Vanguard Ventures. Although not an expert in computer programming, Manber held a degree in electrical engineering and had worked with computers most of his professional career. Manber performed a brief inspection in Paffendorf's New York office of the printed coding for the computer program as it existed in December of 1978, but he did not run the program on a minicomputer. Although the inspection report stated that Manber's opinion with regard to the completion of stage two was based on "extensive questioning of the principal developers of the [computer] programs," Manber did not consult with either Hagler or Keane about the capabilities of the program.

On the same day that Manber inspected the Reportco computer program, he also inspected a prototype rotary engine that Hi-Tech employees were developing for another Paffendorf limited partnership. Manber signed nearly identical, one-page documents that he did not personally draft, which certified that research was completed by Hi-Tech on both the Reportco and rotary engine projects. Thereafter, on December 31, 1978, Reportco issued to Hi-Tech a nonrecourse promissory note in the principal amount of $400,000, on terms similar to the December 31, 1977, nonrecourse promissory note.

The parties agree that no work on stage three of the Reportco project ever was commenced by Keane, and by the spring of 1979, if not earlier, it is clear that the Reportco project was abandoned. Keane resigned his employment with COAP in April of 1979. Paffendorf made some unsuccessful attempts to sell the research completed on the minicomputer program for preparing tax returns. He even-

tually liquidated Reportco's assets. Keane shipped the paper work reflecting the work that had been completed on the tax return preparation program and the general ledger accounting system to Paffendorf's office in Albertson, New York, where it was stored. Reportco made a final cash payment to Hi-Tech in the amount of $75,000, which apparently represented the balance due Hi-Tech under the R & D agreement with respect to work allegedly performed under stage two of the R & D agreement. Reportco did not pay Hi-Tech the remaining $100,000 cash due, nor did it issue the additional $200,000 nonrecourse promissory note with respect to stage three of the R & D agreement.

On or about March 10, 1979, Digitax sold its mainframe computer program for the preparation of tax returns and its customer base to Comshare, Inc., a publicly held corporation, for a stated purchase price of $3,600,000. The consideration received by Digitax was comprised of 111,111 shares of Comshare stock, which was trading over the counter for approximately $24 per share at the time of the sale to Comshare. This sale occurred independently, and apparently in disregard, of the license agreement Digitax had entered into with Reportco with respect to the use by Reportco of the Digitax computer program.

### Books and Financial Records of Reportco

The books and financial records of Reportco were kept in Albertson, New York, by an employee of Phoenix Resources, Reportco's managing general partner. Reportco filed its Forms 1065 partnership returns on a calendar year basis under the accrual method of accounting. The income and deductions reported by Reportco that give rise to the partnership losses which flowed through the partnership to petitioners herein were as follows:

|  | 1977 | 1978 | 1979 | Totals |
|---|---|---|---|---|
| *Income:* | | | | |
| Gross receipts | - - - | $102,433 | - - - | $102,433 |
| Less cost of goods sold | - - - | (71,395) | - - - | (71,395) |
| Interest | $11,234 | 13,900 | $298 | 25,432 |
| Other | 3,431 | - - - | - - - | 3,431 |
| Total income: | 14,665 | 44,938 | 298 | 59,901 |

*Deductions:*

| | | | | |
|---|---|---|---|---|
| Depreciation | $89,395 | $214,504 | $214,174 | $518,073 |
| Interest | 84,835 | 104,000 | 130,555 | 319,390 |
| | *1977* | *1978* | *1979* | *Totals* |
| Management fees | $36,000 | $36,000 | $30,000 | $102,000 |
| Other deductions: | | | | |
|   Research and development | 500,000 | 500,000 | 300,000 | 1,300,000 |
|   Professional fees | 8,333 | 4,317 | 3,335 | 15,985 |
|   Operating expenses | 16,384 | 17,573 | 5,559 | 39,516 |
|   Other | - - - | - - - | 7,401 | 7,401 |
| Total deductions: | 734,947 | 876,394 | 691,024 | 2,302,365 |
| *Loss:* | 720,282 | 831,456 | 690,726 | 2,242,464 |

The limited amount of income reported by Reportco is attributable primarily to interest accrued on the recourse notes issued to it by its limited partners, and, in 1978, to proceeds from the sale to Sonic of the minicomputer and of the customized accounting system developed for Sonic.

The $518,073 depreciation claimed on Reportco's partnership returns relates primarily to the costs associated with Reportco's acquisition of rights to the Digitax computer program under the license agreement and was based on a cost therefor of $1,500,050 spread over a 7-year useful life on a straight-line method. Depreciation on Reportco's office furniture also was deducted. The interest deducted by Reportco over the 3 years in the total amount of $319,390 relates to the $1,200,000 nonrecourse promissory note issued to Digitax under the license agreement, the two $400,000 nonrecourse promissory notes issued to Hi-Tech, and the $200,000 debt obligation owed to Hi-Tech under the R & D agreement. Of the total interest deducted of $319,390, only $79,500 actually was paid by Reportco to Digitax in 1977. Reportco elected to defer until 1982 and 1983 all other interest payments due in 1977, 1978, and 1979 under the $1,200,000 promissory note to Digitax and the two $400,000 promissory notes to Hi-Tech.

The deductions claimed for research and development relate to amounts actually paid to Hi-Tech under the R & D agreement ($100,000 in 1977; $25,000 in 1978; and $75,000 in 1979) and to amounts accrued thereunder ($400,000 in 1977; $475,000 in 1978; and $225,000 in 1979). Reportco

also claimed investment tax credits in the amount of $150,114 in 1977 with respect to its use of the Digitax computer program and the purchase of office furniture.

Petitioners claimed their distributive shares of Reportco's losses and investment credits as follows:

*Joel and Irene Hagler*

|  | 1977 | 1978 |
|---|---|---|
| Partnership loss | $12,000 | $21,778 |
| Investment credit | - - - | - - - |

*Frederick M. and Jane G. Dahlmeier*

|  | 1977 | 1978 | 1979 |
|---|---|---|---|
| Partnership loss | $21,264 | $26,215 | $13,357 |
| Investment credit | 5,516 | - - - | - - - |

*Thomas C. and Joann Mullen*

|  | 1977 | 1978 | 1979 |
|---|---|---|---|
| Partnership loss | $21,264 | $26,215 | $21,788 |
| Investment credit | 4,759 | - - - | - - - |

At trial, testimony and documentary evidence were introduced by expert witnesses concerning, among other things, the value of the license agreement for use of the Digitax computer program and the value of the research and development to be performed by Hi-Tech for Reportco under the R & D agreement.

### OPINION

### I. Petitioners' Bases With Respect to Nonrecourse Promissory Notes

Petitioners assert that their bases with respect to their investments in the Reportco partnership increased due to the $1,200,000 nonrecourse promissory note Reportco issued to Digitax on December 31, 1976. Respondent asserts that the $1,200,000 nonrecourse promissory note was illusory as of December 31, 1976, and therefore that the promissory note, to the extent it became a genuine debt obligation after December 31, 1976, was subject to the at-risk rule of section 704(d)[5] (the predecessor to section 465(b)), which rule became effective on January 1, 1977, for liabilities incurred on or after January 1, 1977. Accordingly, respondent argues

---

[5]All section references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

that petitioners' bases in Reportco cannot include any portion of the $1,200,000 nonrecourse promissory note.

Under the facts of this case, it is quite clear that the handwritten license agreement and the related $1,200,000 promissory note prepared by Paffendorf on the afternoon and evening of December 31, 1976, were illusory for Federal tax purposes on that day. The license agreement and the $1,200,000 nonrecourse promissory note were drafted by Paffendorf without negotiations, without any meaningful effort to appraise the property subject to the license or to determine the amount of the purchase price with respect thereto that legitimately could be financed on a nonrecourse basis, and without the approval of the licensor (Reportco), the general partner of Reportco (Phoenix Resources), or of the controlling shareholder of the general partner (Vanguard Ventures).

The individual who signed the license agreement on behalf of Reportco, Bruce Ridulfo, did not work for Reportco, nor for Phoenix Resources. He was a clerical employee of Vanguard Ventures and had no authority in that capacity to sign the license agreement on behalf of Reportco. Mr. Tartar signed the license agreement on behalf of Digitax as its president. No negotiations occurred with respect to the terms of the license agreement. Mr. Tartar simply signed it because he was asked to do so by Paffendorf. That the license agreement and nonrecourse promissory note were not seriously negotiated and entered into as good-faith obligations on December 31, 1976, is evidenced further by the retroactive recharacterization of the license agreement as a sale in June of 1977.

It is evident that the license agreement and the $1,200,000 nonrecourse promissory note associated therewith were prepared and signed at the last moment on December 31, 1976, simply in an effort to avoid the effective date of the at-risk rule of section 704(d). There was no intention that the obligation to pay principal and interest due under the nonrecourse promissory note become viable and enforceable on December 31, 1976. Paffendorf merely attempted to create, on that day, for purposes of Federal income taxation, a debt obligation which nominally was incurred prior to the effective date of section 704(d). In

actuality, however, whatever liability arose under the note was not intended to be effective until sometime after December 31, 1976. As the Ninth Circuit stated in *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975), for Federal income tax purposes "the debt must exist; potential existence will not do." (544 F.2d at 1049.) Many of the facts on this issue are not significantly different from those present in *Gauntt v. Commissioner*, 82 T.C. 96 (1984), revd. and remanded on another issue sub nom. *Heinz v. Commissioner*, 770 F.2d 874 (9th Cir. 1985), and *Alterman Foods, Inc. v. United States*, 505 F.2d 873 (5th Cir. 1974), and we reach a similar conclusion herein.

Because the $1,200,000 nonrecourse promissory note of Reportco was not a valid obligation on or before December 31, 1976, that note (to the extent it became a valid debt obligation after December 31, 1976) is subject to the at-risk rule of section 704(d)[6] which applies to liabilities incurred by a partnership on or after January 1, 1977. Additionally, the two $400,000 promissory notes of Reportco that were executed in 1977 and 1978 and the $200,000 debt obligation, all of which relate to the R & D agreement, are nonrecourse and are, therefore, subject to the at-risk rule of section 704(d).

It is not clear, on the record before us, whether the three $100,000 deferred cash obligations of Reportco to Hi-Tech under the R & D agreement were recourse as to Reportco and the general and limited partners of Reportco. If they were nonrecourse, those debt obligations would, of course, be subject to the at-risk rule of section 704(d) (for liabilities incurred in 1977 and 1978) and section 465(b) (for liabilities incurred in 1979) and petitioners' bases in their investments

---

[6]Sec. 704(d) (the predecessor to sec. 465(b)) provides as follows:

SEC. 704(d). LIMITATION ON ALLOWANCE OF LOSSES.—A partner's distributive share of partnership loss (including capital loss) shall be allowed only to the extent of the adjusted basis of such partner's interest in the partnership at the end of the partnership year in which such loss occurred. Any excess of such loss over such basis shall be allowed as a deduction at the end of the partnership year in which such excess is repaid to the partnership. For purposes of this subsection, the adjusted basis of any partner's interest in the partnership shall not include any portion of any partnership liability with respect to which the partner has no personal liability. The preceding sentence shall not apply with respect to any activity to the extent that section 465 (relating to limiting deductions to amounts at risk in case of certain activities) applies, nor shall it apply to any partnership the principal activity of which is investing in real property (other than mineral property).

in Reportco would not be increased by their respective distributive shares of those obligations. If, however, the three $100,000 deferred cash obligations of Reportco to Hi-Tech were recourse as to Reportco and the general and limited partners of Reportco, respondent argues that such obligations do not represent true indebtedness and therefore do not increase petitioners' bases in their investments in Reportco. For the reasons set forth in the next section of this opinion, we find that the three $100,000 deferred cash obligations of Reportco to Hi-Tech do not constitute genuine indebtedness and do not increase petitioners' bases in Reportco. Accordingly, petitioners' bases in Reportco do not include any of the purported debt obligations of Reportco to Digitax or to Hi-Tech.

## II. Interest Deductions on Nonrecourse Promissory Notes

Petitioners assert that interest due on the $1,200,000 nonrecourse promissory note from Reportco to Digitax and the two $400,000 nonrecourse promissory notes from Reportco to Hi-Tech is deductible in the year paid or accrued. Petitioners also assert that interest on the $200,000 nonrecourse debt obligation from Reportco to Hi-Tech, with respect to which no promissory note was issued, is deductible as interest in the year it accrued.[7]

Respondent asserts that the nonrecourse promissory notes and the $200,000 nonrecourse debt obligation do not represent genuine indebtedness and that interest paid and accrued on those notes and debt obligation therefore is not deductible. After a careful examination of the facts relevant to this issue, we agree with respondent. We note that the instant issue is relevant only to the extent petitioners had bases in their partnership investments, independent of the nonrecourse debt obligations, to support the losses generated by the interest deductions claimed. Sec. 704(d).

The parties argue extensively over the value of the rights Reportco received from Digitax under the license agreement and from Hi-Tech under the R & D agreement. Respondent

---

[7]Interest was not due with respect to the $300,000 deferred cash payment that was due under the license agreement, nor with respect to three $100,000 cash payments due under the R & D agreement. Petitioners, however, do claim an interest deduction for $7,500 that apparently was paid as interest with respect to the $300,000 deferred cash obligation under the license agreement.

contends that the value of those rights was no more than a total of $870,375. Respondent, therefore, concludes that the total of $2,800,050 Reportco agreed to pay for those rights was excessive and the debt portion of the purchase price does not constitute genuine indebtedness. Respondent cites *Estate of Franklin v. Commissioner, supra*, and *Odend'hal v. Commissioner*, 748 F.2d 908 (4th Cir. 1984), affg. on this issue and remanding on another issue 80 T.C. 588 (1983).

The key factor that influences our decision concerning the character of the debt obligations of Reportco is the complete absence of any meaningful or valuable security or collateral supporting the obligations. The $1,200,000 promissory note from Reportco to Digitax was secured only by Reportco's rights under the license agreement and by minicomputer programs that might be developed in the future under stages one and two of the R & D agreement. The rights to the Digitax computer program consisted only of Reportco's nonexclusive right to use the Digitax computer program. Digitax continued to use its program in connection with its own business after the license was given to Reportco. Digitax also had the right to sell or license that program to others (note the sale in 1979 to Comshare). Thus, if Reportco defaulted on its $1,200,000 debt obligation to Digitax, Digitax could foreclose on the collateral under the note but would receive no asset of value it did not already own unless the minicomputer program had been developed. Furthermore, the security interest of Digitax in any minicomputer program that might be developed sometime in the future represented nothing with a present value in 1977 or 1978. In other words, there was no security of any real economic value given to Digitax to support the $1,200,000 promissory note of Reportco. In actuality, the note was both nonrecourse and unsecured by anything of present value to Digitax.

The security supporting Reportco's total $1 million nonrecourse debt obligation to Hi-Tech under the R & D agreement is even more tenuous. Such security consisted of the right to any minicomputer programs developed under stages one and two of the R & D agreement and then only on a subordinated basis to rights already granted to Digitax therein under the $1,200,000 promissory note issued to

Digitax. As stated, such rights to something which may or may not be developed in the future, particularly under the facts of this case, had no present economic value to Hi-Tech at the time the R & D agreement was entered into. Thus, the $1 million owed to Hi-Tech also was both nonrecourse and completely unsecured by anything of present economic value to Hi-Tech.

We also are influenced in our decision on this issue by the unusual circumstances surrounding the signing of the $1,200,000 promissory note on December 31, 1976, the preparation of the handwritten license agreement, the unilateral determination by Paffendorf of the $1,500,050 consideration to be paid by Reportco for the rights received under the license agreement, and the non-arm's-length nature of all aspects of the transaction.

Another indication that the nonrecourse debt obligations did not constitute genuine indebtedness is the fact that the principal amount of the obligations unreasonably exceeded the value of the rights to use the Digitax computer program under the license agreement and the value of the research to be undertaken by Hi-Tech under the R & D agreement. Expert witnesses testified at the trial and submitted lengthy reports supporting petitioners' and respondent's respective positions as to the value of the rights received under the two agreements. Petitioners' experts concluded that the license agreement and the R & D agreement had a total combined value to Reportco of at least $3,980,000. Respondent's expert concluded that those agreements had a total combined value of no more than $895,700. A schedule follows reflecting the principal amount of the debt obligations associated with each agreement and the respective values placed on each agreement by the parties:

| | Reportco's debt obligations | Value to: Petitioners' experts: At least | Value to: Respondent's expert: No more than |
| --- | --- | --- | --- |
| License agreement | $500,000 | $2,000,000 | $227,250 |
| R & D agreement | 1,300,000 | 1,980,000 | 668,450 |
| Total | 2,800,000 | 3,980,000 | 895,700 |

It is not necessary for us to discuss the numerous arguments the various experts make to support their

respective values. The major error in the valuations of each of the experts is their failure to consider that Digitax gave up very little under the license agreement. Digitax continued to own the computer program for the preparation of tax returns and it continued to use the program in its business. It granted to Reportco, a related company, only a nonexclusive license to use the program for a stated period of time. We find it incredible that an arm's-length purchaser would have agreed to pay anywhere near $1,500,050 for the limited rights it received with respect to the Digitax computer program. Based on the credibility, or lack thereof, of the expert witnesses, our examination of their reports and all aspects of this transaction, we conclude that the value of the license agreement was no more than $230,000.

With regard to the R & D agreement with respect to which Reportco was obligated to pay Hi-Tech a total of $1,300,000 (including the nonrecourse promissory notes and the deferred cash payments), we conclude that the value of the R & D agreement was no more than $670,000. Our conclusion is based on the testimony of the expert witnesses and our examination of their reports. We note particularly the failure of petitioners' expert witness report that was admitted into evidence to address the value of the R & D agreement.

In light of the significant discrepancies that exist between the maximum fair market values we have determined for the license agreement ($230,000) and the R & D agreement ($670,000), on the one hand, which together represent a combined maximum fair market value of $900,000, and on the other hand, the principal amount of the indebtedness totaling $2,800,000, and in light of the other factors previously mentioned, we conclude that the purported debt obligations in question herein in the total amount of $2,800,000 did not represent genuine indebtedness.[8] In

---

[8]We note that in *Brannen v. Commissioner*, 78 T.C. 471, 493 (1982), affd. 722 F.2d 695 (11th Cir. 1984), this Court stated that the test was whether the stated purchase price unreasonably exceeded the value of the property, whereas in *Hager v. Commissioner*, 76 T.C. 759, 773-774 (1981), this Court stated that the test was whether the principal amount of the nonrecourse indebtedness unreasonably exceeded the value of the property. We need not decide which test is appropriate on the facts before us because both the purchase price and the principal amount of the nonrecourse indebtedness unreasonably exceeded the value of Reportco's combined rights under the license agreement and the R & D agreement. See *Fuchs v. Commissioner*, 83 T.C. 79, 102 (1984).

*Hager v. Commissioner*, 76 T.C. 759 (1981), we stated as follows:

It is settled that amounts paid as interest must be paid on genuine indebtedness to be deductible under section 163(a) (*Knetsch v. United States*, 364 U.S. 361 (1960); *Narver v. Commissioner*, 75 T.C. 53, 98 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982); *Golsen v. Commissioner*, 54 T.C. 742, 754 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971)), and that depreciation must be based on an actual investment in property to be deductible under section 167 (*Narver v. Commissioner, supra* at 98; *Mayerson v. Commissioner*, 47 T.C. 340, 350 (1968)). In the usual sale of property, if part or all of the purchase price is deferred, the obligation to pay the deferred amount represents genuine indebtedness and an investment in property. Even if such an obligation is secured only by the transferred property or other property and the buyer has no personal liability for its payment, the obligation still represents genuine indebtedness and an investment in property. *Mayerson v. Commissioner, supra* at 351-352; see *Crane v. Commissioner*, 331 U.S. 1 (1946). However, such conclusions do not follow when the principal amount of such nonrecourse indebtedness unreasonably exceeds the value of the security therefor because, under such circumstances, it is patent that the purchaser has no incentive to pay off the obligation. [76 T.C. at 773-774].

Those principles apply in this case and require that the alleged total indebtedness of $2,800,000 be recognized for what it was—something other than genuine indebtedness. Interest deductions claimed with respect thereto, whether paid or accrued, are not deductible by Reportco.

Amounts that actually were paid by Reportco to Digitax in connection with this transaction as interest on the alleged debt obligations ($7,500 in 1977 allegedly on the $300,000 deferred cash payment and $72,000 in 1977 on the $1,200,000 promissory note) are to be treated as capital expenditures of Reportco with respect to the license agreement.

### III. *Accrual of Interest Expenses*

As an alternative basis for disallowing deductions claimed for interest accrued on the promissory notes, respondent raises the argument that interest payments allegedly due thereunder in 1977, 1978, and 1979, the years in dispute herein, did not have to be paid in the year the payments nominally accrued, but could be and, in fact, were deferred at the discretion of Reportco until 1981 and 1982. Respon-

dent therefore argues that the interest accruals do not meet the all-events test of section 1.461-1(a)(2), Income Tax Regs. It is an elementary principle of tax accounting that accrued liabilities cannot be deducted until the fact of liability for the payments in the years the deductions are claimed and the amount of the payments to be made are fixed and determined. *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 543 (1979); *Vastola v. Commissioner*, 84 T.C. 969, 979 (1985).

In light of the unilateral right of Reportco to defer payment of the interest allegedly due, and in light of the fact that Reportco did exercise that right for all interest nominally due in 1978 and 1979, petitioners' accrual thereof in those years was improper.

## IV. Profit Motive of Reportco

Reportco claims large and numerous deductions for expenses paid and accrued in 1977, 1978, and 1979 with respect to its efforts to develop a minicomputer program for the preparation of income tax returns and for a general ledger accounting system. Petitioners allege that Reportco was in the trade or business of developing computer software programs for profit. Respondent alleges that the primary purpose of Reportco was to generate tax deductions for investors and that it was not engaged in any trade or business for profit.

The expenses that Reportco claims in 1977, 1978, and 1979, and that turn on the trade or business or profit motive issue are summarized below:

| Type of expense | 1977 | 1978 | 1979 |
|---|---|---|---|
| Research and development | $500,000 | $500,000 | $300,000 |
| Depreciation | 89,395 | 214,504 | 214,174 |
| Management fees | 36,000 | 36,000 | 30,000 |
| Professional fees | 8,333 | 4,317 | 3,335 |
| Operating expenses | 16,384 | 17,573 | 5,559 |
| Totals | 650,112 | 772,394 | 553,068 |

Investment credits in the total amount of $150,114.80 also are claimed by Reportco with respect to the Digitax computer program and office furniture.

Deductions claimed for depreciation under section 167,

and for management and professional fees and operating expenses under section 162 or section 212 are allowed only if the expenses are incurred in connection with the taxpayer's trade or business or in connection with the production of income. In order to so qualify, the underlying activity must be associated with an "actual and honest objective of making a profit." *Dreicer v. Commissioner*, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); *Dean v. Commissioner*, 83 T.C. 56 (1984); *Lemmen v. Commissioner*, 77 T.C. 1326, 1340 (1981).

Although a taxpayer's expectation of profit need not be reasonable, the profit motive of the taxpayer must be bona fide. *Fox v. Commissioner*, 80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984), affd. in unpublished orders sub nom. *Hook v. Commissioner, Krasta v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner*, 734 F.2d 5-7, 9 (3d Cir. 1984).

The analysis of whether the requisite profit motive exists is made at the partnership level, and therefore, we must examine the motive and objectives of the promoter and the general partners of Reportco. *Brannen v. Commissioner*, 78 T.C. 471, 505 (1984), affd. 722 F.2d 695, 704 (11th Cir. 1984); see also *Surloff v. Commissioner*, 81 T.C. 210, 233 (1983); *Siegel v. Commissioner*, 78 T.C. 659, 698 (1982).

Allowance of the investment credits claimed by Reportco depends on, among other requirements, whether the computer program and furniture qualify for depreciation under section 167. See sec. 48(a)(1). Thus, availability of the investment credits also turns on the presence of a trade or business or good-faith profit motive.

Although deductions claimed for research and development expenses under section 174[9] only need be incurred "in connection with" a trade or business rather than "in carrying on" a trade or business (see *Snow v. Commissioner*, 416 U.S. 500 (1974), the underlying research and development activity still must qualify as a trade or

---

[9]The parties agree that deductibility of the research and development expenses claimed herein relating to the R & D agreement is governed by sec. 174. See Rev. Proc. 69-21, 1969-2 C.B. 303.

business at some time. *Green v. Commissioner*, 83 T.C. 667, 686-687 (1984).[10]

There is no question that the primary individuals involved in the Reportco project were experienced professionals. Hagler was a tax specialist, Keane was a computer programmer, and Paffendorf was a syndicator of tax shelter investments. The conversion of the Digitax computer program to minicomputer use, if completed and updated annually, had the potential to be profitable. Nevertheless, we conclude that the overriding objective and purpose of Reportco and its activities in 1977, 1978, and 1979 was to secure large tax writeoffs for the limited partners and to generate funds which would be paid as fees to Paffendorf or to companies in which he had substantial interests. Our conclusion is based in large part on the conduct of Paffendorf, on the excessive and inflated debt associated with the transaction, and on the manner in which Reportco conducted its activities with respect to the entire transaction.

The unbusinesslike manner in which the license agreement and the $1,200,000 nonrecourse promissory note were drafted and signed late in the day on December 31, 1976, demonstrates Paffendorf's primary intention to circumvent the at-risk rule of section 704(d) (the predecessor of section 465(b)), which was to become effective the following day. His actions establish that his predominant motive in having Reportco enter into the license agreement and obligate itself to the tune of $1,500,050 was to provide a vehicle from which large losses would flow to investors based on the use of inflated, nonrecourse liabilities.

There is no credible evidence in the record that the price agreed to for the license of the Digitax computer program and for the research and development to be performed by Hi-Tech were in any way determined with regard to the potential profit of a minicomputer program for the preparation of tax returns. See *Fox v. Commissioner, supra* at 1004-1005. Paffendorf did not even attempt to obtain an appraisal until September of 1977. Incredibly, the terms of

---

[10]See *Hoerrner v. Commissioner*, T.C. Memo. 1985-347; *Shaller v. Commissioner*, T.C. Memo. 1984-584, on appeal (4th Cir., June 25, 1985); *Lahr v. Commissioner*, T.C. Memo. 1984-472, affd. sub nom. *Independent Electric Supply, Inc. v. Commissioner*, 781 F.2d 724 (9th Cir. 1986).

these million-dollar-plus agreements were not arrived at through bargaining or anything close to arm's-length negotiations, but were determined unilaterally by Paffendorf. Moreover, Paffendorf had no incentive to keep the cost of the project down because he was one of the primary beneficiaries of amounts expended by Reportco by virtue of fees paid to him directly by Reportco and by virtue of fees paid to Digitax and Hi-Tech in which he benefited through his direct and indirect ownership of those two companies. See *Fox v. Commissioner, supra* at 1009.

The existence of large, nonrecourse notes in circumstances where it is not likely the notes will be paid is itself an indication that the primary objective of the activity is to generate tax deductions. See *Thomas v. Commissioner*, 84 T.C. 1244, 1280 (1985), and cases cited therein. As we stated previously in *Flowers v. Commissioner*, 80 T.C. 914, 937 (1983)—

Where there is a small cash downpayment and the remainder of the acquisition price is satisfied with nonrecourse indebtedness that is not supported by the fair market value of the property acquired, the possibility exists that the acquisition was undertaken to generate tax benefits. Thus, where other factors are present, the existence of a highly inflated nonrecourse note can contribute to a finding that the activity with respect to which the property was acquired was not entered into for profit. It is the presence of the nonrecourse indebtedness that creates the potential for shenanigans, and where it is found that a transaction lacked economic motivation but rather was undertaken primarily to reduce taxes by generating deductions and credits attributable to an inflated basis derived predominantly from nonrecourse indebtedness, such indebtedness is not merely self-destructive, but can taint the entire transaction. [Fn. ref. omitted.]

We do not dispute that Hagler and Keane, initially, may have been guided in part by profit motives. The structure of the agreements, the inflated debt, and the tax-driven aspects of the transaction, however, taint the underlying purpose of the entire partnership. It is abundantly clear that Paffendorf set up the project with the primary objective of personally benefiting from the infusion of cash into entities which he controlled and of benefiting limited partners primarily through large tax deductions. Reportco, in connection with the license agreement and the R & D agreement, had no significant purpose or business activity

that was undertaken in a businesslike manner in 1977, 1978, or 1979.

Work under the R & D agreement occurred only during August of 1977, through early 1978. Hagler quit the project in February of 1978. In January of 1978, Keane put aside the work called for under the R & D agreement with Reportco to pursue work in connection with another customer, Sonic. Because of the nonrecourse nature, as to Reportco itself, of the debt obligations in question herein, the success of Reportco in connection with other projects or customers would not have assisted Reportco to pay off its debts to Digitax or Hi-Tech under the license agreement and the R & D agreement. In June of 1978, Reportco sold to Sonic its only minicomputer, and thereby precluded any further programming work on the Reportco R & D project.

We note the inaccuracy of the inspection report issued by Mr. Manber on December 9, 1978, which certified that work under stage two of the R & D project had been completed by December of 1978. Manber's close relationship to Paffendorf, his lack of expertise in computer programming, his failure to actually test the program on a computer, and the superficial manner in which he performed the inspection are factors that apparently led to the certification he gave. We reiterate that after February of 1978, essentially no work was done on the R & D project.

In spite of the absence of work on the R & D project during the last 10 months of 1978, however, in December of 1978 Reportco paid to Hi-Tech $25,000 cash and gave Hi-Tech the second $400,000 promissory note for work allegedly completed under stage two of the R & D agreement. In 1979, another $75,000 in cash was paid by Reportco to Hi-Tech in connection with the R & D agreement. The parties agree that by early 1979, the Reportco R & D project was abandoned entirely. No research on stage three ever was started, yet Reportco deducted a $300,000 accrued research and development expense for work that was to be performed under stage three. The payments made and notes issued by Reportco in 1978 and 1979 are particularly indicative of the unbusinesslike manner in which Reportco operated. As explained, such obligations were completely dependent on work completed under the R & D agreement.

Since the work was not done, Reportco had no obligation to make the payments or to issue the notes.

Other than nominal interest income, the only income Reportco realized related to the sale to Sonic for $30,000 of the minicomputer hardware and software, but Reportco's partners deducted losses in the aggregate amounts of $720,282, $831,456, and $690,726, in 1977, 1978, and 1979, respectively. It is clear that none of the parties involved with the Reportco license agreement and the Reportco R & D agreement had the good-faith intention of making a profit therefrom. Because Reportco, therefore, was not engaged in a profit-seeking activity, investment credits and expenses it incurred for research and development, depreciation, management and professional fees, and operating expenses relating to the conversion of the Digitax minicomputer program are disallowed.

In light of our disallowance of the investment credits on the ground that Reportco's activities in connection with the license agreement and the R & D agreement did not constitute a good-faith profit-seeking endeavor, it is not necessary to address respondent's alternative argument that Reportco's investment in the Digitax computer program did not qualify for investment credits because it did not constitute tangible personal property as defined by section 48.

## V. Substantiation

Even though the management fees, professional fees, operating expenses, and "other" expenses in dispute herein are not deductible under section 162 or 212, as discussed above, they would be deductible under section 183 to the extent of gross income derived from the activity. Sec. 183(b); *Hager v. Commissioner*, 76 T.C. 759 (1981). Respondent, however, also has disallowed these expenses under section 183 for lack of substantiation.

Petitioners have submitted no credible substantiation of the management fees, or "other expenses," and we sustain respondent on this alternative ground for disallowing these claimed expenses. With regard to operating expenses, petitioners have substantiated, and we allow a deduction to Reportco under section 183 for professional fees incurred in

1978 in the amount of $4,065 and for office rent paid by Reportco in 1977 and 1978 in the amount of $10,188 in each year, to the extent of the gross income realized by Reportco in connection with the license agreement and the R & D agreement.

*Decisions will be entered under Rule l55.*