WARREN ROY TOLSON AND MARGARETHA B. TOLSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tolson v. Commissioner
Docket No. 41406-84.
United States Tax Court
T.C. Memo 1987-578; 1987 Tax Ct. Memo LEXIS 581; 54 T.C.M. (CCH) 1132; T.C.M. (RIA) 87578; November 23, 1987. Warren Roy Tolson, pro se. David L. Miller, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: This action is for redetermination *582 of deficiencies in income taxes of $ 3,015, $ 12,385 and $ 8,332 and section 6651[1] additions to tax of $ 406, $ 2,680 and $ 1,649 for taxable years 1978, 1979 and 1980, respectively, determined by respondent in a statutory notice dated September 14, 1984. It arises out of petitioners' involvement in certain dairy cattle transactions in 1980. After concessions, the issues for our consideration are whether petitioners: (1) Sold certain dairy cattle in 1980; (2) are entitled to depreciation on livestock; (3) are entitled to investment tax credits; and (4) are liable for section 6651 additions to tax for late filing for taxable years 1978, 1979 and 1980. FINDINGS OF FACT The stipulated facts and exhibits are incorporated herein by reference. Petitioners resided in Salt Lake City, Utah, at the time the petition was filed in this case. They filed joint United States individual income tax returns for taxable years 1978, 1979 and 1980, which returns were received by respondent on *583 October 30, 1981. Petitioners are cash method, calendar year taxpayers. Other issues having been settled by the parties, the only issues remaining for consideration involve the dairy cattle transactions. Petitioners's [2] educational background is that of a civil engineer. During 1980, petitioner (Tolson) was employed by Allstate Insurance Company as an insurance agent. In addition, petitioner operated a tax preparation and tax consultation business. Prior to 1980, petitioner had no experience with the dairy industry, but had done some research prior to entering into the transactions described below. Prior to his involvement with dairy cattle, he had promoted cherry orchard and art lithograph ventures. [3]
First "Sale"
In October 1980 Tolson met with dairy owner Clair Yardley (Yardley) to discuss the possible purchase of Yardley's *584 dairy herd. [4] Yardley unilaterally set the price at $ 1,500,000, or $ 3,000 per head for 320 adult and 180 replacement animals. Petitioner did not offer a lower price, nor did he obtain an appraisal of the herd. At petitioner's request Yardley engaged a herdsman from the Utah State University to break the adult animals into four groups, from highest to lowest quality. Then Yardley assigned a value to each group, adding up to the total $ 1,500,000, as follows: 33 Grade A $ 8,400
$ 277,200  136 Grade B
4,400
598,400
120 Grade C
2,500
300,000
31 Grade D 1,000
31,000
180 Replacement
1,630
293,400
Total
$ 1,500,000
There was variation within the grades. The assigned value was an average for animals within the grade. Any given animal within the group could be of greater of lesser quality. [5]
Yardley represented that all the animals were registered. *585 A registered animal is one whose blood line can be traced. A cow that is not registered is known as a grade animal. Because their ancestry can be traced, registered animals are more valuable than grade animals of similar quality. On December 30, 1980, W. Roy Tolson (purchaser) and TryDale Dairy Corporation along with Clair Yardley (sellers) entered into several agreements regarding a dairy herd of 320 Fresian Holstein dairy animals and 180 representative or replacement animals. [6] These agreements included a purchase agreement, a security agreement, a joint venture agreement, an employment contract, a dairy facility rental agreement, and a processing and marketing producers agreement. These agreements are summarized briefly below. Through the purchase agreement, petitioner purported to purchase the *586 dairy herd. The total purchase price was $ 1,500,000. At closing of the sale, $ 37,500 cash was paid and the remainder was financed with two notes. The first was a negotiable promissory note due April 1, 1981, bearing interest at the rate of 9 percent with a principal amount of $ 227,500. The second note was a nonrecourse negotiable promissory note bearing interest at the rate of 12 percent due in six equal annual installments with a principal amount of $ 1,235,000. The dairy herd was used as security for the two notes. Paragraph seven of the security agreement absolves the buyer from personal liability on the notes. Petitioner could not remove any of the cattle from the sellers' facility without the prior express written approval of the sellers. The joint venture agreement related to petitioner's purported sales to other investors. Under that agreement petitioner and Yardley split 30 percent (15 percent each) of the net profits from dairy operations attributable to the cattle sold. [7]
*587 In the remaining agreements petitioner employed sellers to provide housing, milking, medical care, corrals and amenities and otherwise manage and provide care for the herd. Ostensibly, petitioner was entitled to the net receipts from dairy operations. The registration certificates currently reflect the sellers as the owners of the herd. In effect, the cattle remained in place at the same location as a result of the sale-management agreements. Petitioners claimed depreciation deductions and investment tax credits on their 1980 income tax return regarding 19 dairy animals from the herd referred to above. The names, identification numbers, cost basis assigned to each, and our determination of the fair market value (FMV) [8] of the 19 cows are in the schedule below. [9]
*588 Cow Name
Registration or Ear Tag Number
Cost
FMV
Warrior Nema
10721051   $ 2,500 $ 2,000 Lucky Star
10541975   2,500
1,800
Lodestar
9151972    2,500
1,600
unknown
87WBG0157 *
2,500
900
M. E. Don
10149266   2,500
1,500
Janice Elev.
10104309   4,400
3,000
B. Warrior
10225397   4,400
2,000
unknown
87WBG0156  4,400
900
unknown
87WBG0158  4,400
900
unknown
87WBG0159  4,400
900
unknown
87WBG0160  4,400
900
unknown
87WBG0152  2,500
900
unknown
87WDD6622  2,500
900
unknown
87WBG0154  2,500
900
unknown
87WBG0155  2,500
900
Lucky Ann
9656296    8,400
2,500
E. Pride
9733477    4,400
2,000
Rose Marie
10326401   2,500
1,800
H. Ivanhoe
8403651    2,500
1,000
TOTAL
$ 66,700
$ 27,300
Second "Sales"
Petitioner entered into agreements purportedly to sell 72 specific Holstein Fresian dairy animals, and 40 representative animals from the dairy herd to eight individual investors during 1980. [10] Each investor chose the same management *589 and care alternatives; the investors leased space from petitioner, who had previously leased the same space from Yardley, and entered into agreements to have the animals cared for by persons under contract with petitioner, who had previously engaged Yardley to care for the animals. The documents signed by each of the individuals differed only in the number of animals involved, specific identity of the animals, the dollar amounts charged, and the names of the buyer and/or lessees. In all other relevant aspects, the documents which petitioner provided the eight individuals were identical. The investors could not sell, remove, destroy or otherwise handle their animals without written permission of petitioner. Ostensibly, each investor was entitled to the net receipts from dairy operations attributable to "his" cattle, subject to assignment, as discussed below. All of the agreements with the investors purported to be signed on December 29 or December 30, 1980. In the aggregate, the eight investors agreed to pay a purchase price of $ 664,000 for 112 cows. The investors' aggregate purchase *590 price was comprised of: (1) Cash down payments totalling $ 37,500; (2) "first" or "down" [payment] notes executed at closing and due March 15, 1981, with 12-percent interest for a total of $ 42,500; (3) negotiable promissory notes (second notes) executed at closing payable in seven annual equal installments with 12-percent interest for a total of $ 288,890; and (4) nonnegotiable promissory notes (third notes) executed at closing and due January 1, 1988, with 8-percent interest for a total of $ 295,110. No investor had any personal liability under either the second or third notes. If there were profits from dairy operations, 30 percent of the net receipts was assigned as prepayment on the third notes. If an investor defaulted on either of such notes, petitioner's only remedy was to enforce his rights under the security agreement and take back any interests of the investors in the cattle. Petitioner reported these sales on the installment method of accounting. He used as his basis the $ 344,130 purchase price of the 112 cattle bought from Yardley the same day. OPINION This case involves the tax consequences to petitioner of his purported purchases and sales of dairy cattle. *591 More specifically, whether the sales to investors should be recognized for tax purposes, and if so, the proper amount of income to be reported under the installment method of accounting. Next, whether and in what amount petitioner is entitled to depreciation deductions and investment tax credits for 19 cattle purportedly segregated for his investment purposes. We will deal with the issues in that order, even though in order of time the first occurred after the second. Respondent did not question the installment sale in his notice of deficiency. Rather, petitioner, for the first time in his trial memorandum, asserted that the percentage of income originally reported under the installment method was too high -- that the third notes should not be included in the amount realized because they were contingent obligations. [11] We allowed respondent to amend his answer to allege that the original figure was correct, and, in the alternative, that no actual sale occurred and the entire down payment received by petitioner was ordinary income. Petitioner should have left well enough alone. We agree with respondent's alternative position that no sale occurred. *592 A sale generally occurs for tax purposes when there is a transfer of property for money or a promise to pay money. Commissioner v. Brown,380 U.S. 563 (1965). The key to determining whether a sale occurred depends on whether the benefits and burdens of ownership passed from the purported seller to the purported purchaser. Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221 (1981). This is a factual determination. Leahy v. Commissioner,87 T.C. 56 (1986); Grodt & McKay Realty, Inc. v. Commissioner, supra.A transaction which is devoid of economic substance will not be recognized for tax purposes. Frank Lyon Co. v. United States,435 U.S. 561 (1978). Fortunately, we have specific legal guidance from a transaction very similar, if not identical to, the one at issue. [12]Zirker v. Commissioner,87 T.C. 970 (1986), dealt with the tax consequences of the purported purchase of cattle by the taxpayer from W. Roy Tolson, petitioner in the instant proceeding. [13] Although the factual *593 predicate is somewhat different -- we are dealing with the same type of transaction from the perspective of the seller [14] rather than the purchaser -- the legal reasoning is the same. In Zirker at 976, we stated: There are several factors to be considered in determining whether what is purported to be a sale in form is also a sale in economic substance. The first is to consider whether the stated price for the property is within a reasonable range of its value. * * * [Fn. ref. omitted.] In Zirker the taxpayer stipulated that the cows were priced at nearly four times their fair market value. While there is no similar *594 stipulation here, petitioner has aided us in the inquiry. He asserts that the purchase from Yardley was at a price equal to fair market value. He then sold the cows to investors for a price of nearly twice that amount. Cows purportedly purchased for approximately $ 334,100 were sold within a day or two for approximately $ 664,000. Assuming, for this purpose only, the Yardley purchase was at fair market value, the stated price would not, in the context of this case, be within a reasonable range when it was doubled. Since a normal attribute of an arm's-length sale is a purchase price at least approximately equal to fair market value, the totally disproportionate purchase price in this instance strongly militates against petitioner's contention that a true sale has taken place. Rose v. Commissioner,88 T.C. 386 (1987); Grodt & McKay Realty, Inc. v. Commissioner, supra;Estate of Franklin v. Commissioner,64 T.C. 752 (1975), affd. on different grounds 544 F.2d 1045 (9th Cir. 1976). The next factor cited in Zirker v. Commissioner, supra at 976, is "whether the purported purchaser had any control over *595 the property and, if so, to what extent." Although no evidence was presented as to the extent of actual control, if any, exercised by the purchaser, the documentary evidence in the instant case appears to be similar to that in Zirker. The purchaser could not remove the cows without petitioner's written permission. He could not choose to care for the animals at a facility of which Tolson did not approve. Through the purchase and management agreements, Tolson actually retained control of the cattle, if he ever had it at all. Further, Tolson could not remove the cattle without written permission of his sellers. In fact, the registration certificates still reflect the original sellers (Yardley and Trydale Dairy) as the owners. Thus, the investors effectively had little or no control over the cattle. A third factor cited in Zirker v. Commissioner, supra at 977, is "whether there was any intent that the stated purchase price of property would ever be paid." Again, there is not much evidence on the question of subjective intent to pay the obligations. However, similar to cases involving profit objective, there is objective factual evidence to shed light on *596 subjective intention. Cf. Rose v. Commissioner, supra;Siegel v. Commissioner,78 T.C. 659 (1982); Engdahl v. Commissioner,72 T.C. 659 (1979). The down payments were small in relation to the total purchase price, less than 10 percent. Both the second and third notes were without recourse to the assets of the buyer. The purchase price was at least double the fair market value of the assets. From these aspects, even considered alone, it is doubtful that the stated price would ever be paid. Petitioner, who is a "hybrid" (both seller and buyer/investor), in an attempt to protect his seller's "flank" has weakened the "heart" of and "udderly" destroyed his buyer/investor argument. He argues that the third notes were payable only out of the net proceeds from dairy operations, so that they were too contingent to include in the amount realized on the installment sale. We do not decide whether that was the legal effect of the notes, or whether petitioner's installment sale computation is correct. It is, however, an additional factor reflecting upon whether the notes would be paid. Petitioner's argument on the note contingencies sheds *597 doubt on the likelihood of their payment. Thus, given these objective facts, it is highly unlikely the parties intended the notes to be repaid. We find that no sale occurred between petitioner and his "buyers" for Federal income tax purposes. Respondent contends that the $ 37,500 received as "down payments" was in reality payment for paperwork used to generate tax deductions -- in essence payment for personal services. We agree with respondent that the entire "sales" proceeds were taxable as ordinary income to petitioner in the year 1980. [15]
The next issue concerns depreciation deductions and investment tax credits on 19 of the cattle purchased from Yardley for which petitioner claims to be a buyer/investor. *598 Petitioner has the burden of establishing the claimed deductions and credits. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). In order to qualify for these deductions and credits, the assets must be used in a trade or business or held for the production of income. Secs. 167(a), 48(a)(1). No depreciation or investment tax credit is allowed on inventory property, property held for sale to customers in the ordinary course of business. Sec. 1.167(a)-2, Income Tax Regs.
Petitioner admits that the remainder of the herd was acquired for sale to customers in the ordinary course of business, but asserts that the 19 were specifically set aside for his ownership and investment. The first question is whether the specific investment cattle were sufficiently identified to set them apart from the remaining inventory cattle. A person may be a dealer in a particular type of asset and yet hold assets of the same nature for investment purposes. Investors Diversified Services, Inc. v. Commissioner,39 T.C. 294, 315 (1962), affd. *599 325 F.2d 341 (8th Cir. 1963); Kemon v. Commissioner,16 T.C. 1026 (1951). Cf. sec. 1236. We find that petitioner segregated his inventory cattle from those held for investment. The next question is whether petitioner held the cows for use in a trade or business or for the production of income. This has become known as the profit objective requirement. Beck v. Commissioner,85 T.C. 557, 569-570 (1985), summarized this requirement as follows: Essential to such a showing is a demonstration that petitioner had "an actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Fuchs v. Commissioner,83 T.C. 79, 98 (1984); Dean v. Commissioner,83 T.C. 56, 74 (1984). While a reasonable expectation of profit is not required, petitioner's objective of making a profit must be bona fide. Fox v. Commissioner,80 T.C. 972, 1006 (1983), affd. * * *. "Profit" in this context *600 means economic profit, independent of tax savings. Herrick v. Commissioner [85 T.C. 236 (1985)]; Surloff v. Commissioner,81 T.C. 210, 233 (1983). Whether petitioner possessed the requisite profit objective is a question of fact to be resolved on the basis of all the facts and circumstances. Elliott v. Commissioner,84 T.C. 227, 236 (1985) [affd. 782 F.2d 1027 (3d Cir. 1986)], and cases cited therein. Although no one factor is determinative, greater weight must be given to objective facts than to petitioner's mere statement of his intent. Siegel v. Commissioner,78 T.C. 659, 699 (1982); Engdahl v. Commissioner,72 T.C. 659, 666 (1979); sec. 1.183-2, Income Tax Regs. * * * [Fn. ref. omitted.] We have used objective factors in determining profit motive. See cases summarized in Rose v. Commissioner, supra at 412-414. Perhaps the two most important objective factors are: (1) The relationship of purchase price to fair market value; and *601 (2) the nature of the debt used to finance the transaction. In assessing whether a taxpayer has the requisite profit objective, one important factual determination is whether the purchase price is approximately equal to fair market value. Fox v. Commissioner,80 T.C. 972, 1009 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Zemel v. Commissioner,734 F.2d 9 (3d Cir. 1984), affd. without published opinion sub nom. Rosenblatt v. Commissioner,734 F.2d 7 (3d Cir. 1984), affd. without published opinion sub nom. Kratsa v. Commissioner,734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Leffel v. Commissioner,734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner,734 F.2d 5 (3d Cir. 1984); Flowers v. Commissioner,80 T.C. 914, 937 (1983); Brannen v. Commissioner,78 T.C. 471, 508 (1982), affd. 722 F.2d 695 (11th Cir. 1984). *602 This is because the ultimate profitability of a venture is measured in terms of the purchase price. This price determines the rate of return on the investment. The hallmark of the so called "abusive tax shelter" is the acquisition of an asset with a highly inflated purchase price financed by nonrecourse debt. The nonrecourse character of the debt is evidence of indifference to economic profit. If the purchase price is inflated, it is unlikely that this price will ever be paid. On the other hand, if the investor must repay the debt under any circumstance he is more obviously interested in the return on his investment. In the setting of this case, there appears to be no valid nontax reason for an inflated purchase price. It reduces the rate of return, lengthens the payback period and vitiates the possibility for resale. In the instant case, the majority of the debt used to purchase the cattle was nonrecourse. Thus, the relationship of price to fair market value of the asset is a proper test of whether there was an honest objective to make a profit. Both petitioner and respondent offered evidence as to the fair market value of the 19 cows. Respondent's expert spent approximately *603 80 hours preparing an appraisal of the subject cattle. He used both comparable auction sales for the years involved and a "cow index" developed by the United States Department of Agriculture. [16] Although the index was not in existence for the year involved, we find the system to be reliable. All of petitioner's cows fall well below the average. In addition, it was reasonable to assume that the 9 animals without registration certificates were not registered. By comparison, petitioner's expert spent only a few hours looking at the pedigrees. While he testified about the need for examining the animal in person, he had not examined the cows. Further, petitioner did not have the cows appraised at the time of purchase. It was only after the total price was settled that the herdman from Utah State was engaged to group the animals in four classifications. Afterwards, Clair Yardley assigned purchase *604 prices totalling $ 1,500,000. In sum, we find respondent's evidence persuasive that the fair market value of the 19 cows was approximately one half of the stated purchase price from Yardley. There are other factors indicating lack of a genuine profit objective. Petitioner did not obtain an independent appraisal. Because the purchase price in any transaction is crucial to the transaction generating a profit, some independent indicator of fair market value is helpful. Indeed, where the taxpayer is inexperienced in the area, it is practically a necessity. See Beck v. Commissioner, supra at 572; Elliott v. Commissioner,84 T.C. 227, 240 (1985), affd. 782 F.2d 1027 (3d Cir. 1986); Fox v. Commissioner, supra.See also Brannen v. Commissioner, supra at 508. The few months of research petitioner conducted in the area of dairy cattle did not make him an expert, nor did it obviate the need for an independent appraisal. In any event, petitioner did not offer the herdsman's testimony to substantiate the basis for his classifications. See Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158 (1946), *605 affd. 162 F.2d 513 (10th Cir. 1947). We hold, based on the foregoing, that the dairy cattle investment was not entered into with a profit objective, but primarily for tax benefits. [17] See sec. 1.183-2(b), Income Tax Regs.
There are other legal impediments to the claimed deductions and credits. The acquisition of the cattle was financed, in the main, by nonrecourse debt. If the purchase price and the principal amount of a nonrecourse note unreasonably exceeds the value of the property acquired, the note does not constitute genuine indebtedness, and cannot be included in the basis of the asset. Elliott v. Commissioner,84 T.C. at 245; Estate of Franklin v. Commissioner,544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Flowers v. Commissioner, supra at 937; Odend'hal v. Commissioner,80 T.C. 588, 604 (1983), affd. on this issue 748 F.2d 908 (4th Cir. 1984); *606 Brannen v. Commissioner, supra at 493; Hager v. Commissioner,76 T.C. 759 (1981). Also at issue is the addition for late filing under section 6651. Petitioner concedes that the returns for 1978, 1979 and 1980 were filed late. His only defense is that there was no understatement of tax, therefore no addition could be computed. Because of the disallowance of the claimed deductions and credits, there was an understatement for the year 1980 and, because of carrybacks of credits, for 1978 and 1979. We agree with respondent that petitioner is liable for the addition. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue. All rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Hereinafter petitioner refers only to petitioner Warren Roy Tolson. His wife is a party to this action only because she filed joint returns with W. Roy Tolson during the years at issue. ↩
3. Respondent argues that these were "abusive tax shelter" promotions similar to the cattle transaction that is the subject of this opinion. ↩
4. Yardley owned only some of the cattle outright. The rest were owned by Trydale Dairy, the Yardley family corporate business in which Clair Yardley was a shareholder.↩
5. We are not concluding that the value assigned was the average fair market value↩ of cows within the grade. 6. In the dairy cattle industry replacement or representative animals include calves, heifers, bred heifers and dry adult animals. A female calf takes from 12 to 14 months to mature, after which time it is a heifer. The mature animal is bred (bred heifer) and 9 months later has a calf. It is then an adult animal which can give milk, and becomes part of the producing herd. ↩
7. The joint venture agreement refers to the 30 percent as a management fee. In the subsequent sales to other investors this amount was delineated as prepayment on the "third notes" given by the investors as part of the purchase price. The investors were ostensibly entitled to the other 70 percent of net profits from dairy operations attributable to "their" cattle. See the discussion regarding Second "Sales," infra.↩
8. In valuing the cattle we adopted the report of respondent's expert. This report was thorough and objective. The testimony of the expert was highly credible. Petitioner's expert, while seemingly knowledgeable, spent only one or two hours looking at pedigrees and did not prepare a written report. His testimony was designed solely to discredit respondent's expert's report. Given petitioner's expert's comparative lack of preparation, we decline to give his testimony any weight. ↩
9. On their 1980 return petitioners list a $ 65,100 basis, apparently due to an addition error. ↩
*. Numbers commencing with 87W are ear tag numbers. The others are registration numbers. ↩
10. Petitioner executed the agreements using his d/b/a appellation, Financial Futures. ↩
11. Normally, respondent will make this argument in the tax shelter setting and petitioner's assertion does not auger well for those who may seek deductions based upon their purported purchase from him. ↩
12. See also Jacobs v. Commissioner,T.C. Memo. 1985-609; Siegel v. Commissioner,T.C. Memo. 1985-441; Hunter v. Commissioner,T.C. Memo. 1982-126↩. 13. The sales at issue in that case occurred approximately 1 year later than those in issue here. ↩
14. The terms seller, sale, purchase, etc., are used for convenience. By using these terms we are not concluding that there was a sale in economic substance.↩
15. In effect, Tolson acted as a conduit between Yardley and investors seeking tax deductions. Tolson funneled the only cash received in the transaction from the investors to Yardley. His "commission" was the deductions and credits on the 19 cattle. This analysis does not change the character of the receipts as ordinary income to Tolson, as he has failed to prove that the receipts were not income. ↩
16. The Department of Agriculture's cow index is used to rate registered dairy cattle. The scale ranges from a low of -2750 to a high of 2884, with average being -252. Petitioner's ten registered cattle rated as follows: -851, -527, -1370, -609, -338, -829, -592, -795, -500, -550. ↩
17. We need not consider whether petitioner obtained the cattle in a bona fide sale transaction. ↩