Judgment will be entered in accordance with this Memorandum.

### JUDGMENT AND ORDER

In accordance with the accompanying memorandum filed today herewith,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that judgment is entered in favor of plaintiff and against defendant on plaintiff's claims of trademark infringement, unfair competition and violation of the Missouri Anti-Dilution Statute.

IT IS FURTHER ORDERED that defendant is permanently enjoined from using its trademark MIKE HOULIHAN'S in the State of Missouri, effective ninety days from the date of this judgment.

IT IS FINALLY ORDERED that defendant's motion to dismiss plaintiff's complaint for lack of standing is DENIED.

Jon C. THOMAS, Plaintiff,

v.

UNITED STATES of America, Defendant.

Nos. 88–0529C(6), 88–0530C(6) and 88–0531C(6).

United States District Court, E.D. Missouri, E.D.

March 8, 1991.

Bernard W. Gerdelman, Timothy F. Noelker, Coburn, Croft and Putzell, St. Louis, Mo., for plaintiff.

Mark T. Keaney, Lewis & Rice, St. Louis, Mo., for Limited partners of Rhineland Cattle partners.

Daniel F. Ross, Reviewer, Tax Div., U.S. Dept. of Justice, Washington, D.C., Henry J. Fredericks, Asst. U.S. Atty., St. Louis, Mo., Stephen Carlton and John Griffith, David Katinsky, Trial Attys., Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM

GUNN, District Judge.

This matter is before the Court on the merits of plaintiff's claims after a seven-day trial before the Court sitting without a jury. This Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 52.

## FINDINGS OF FACT

1. This is a consolidated civil action filed by plaintiff Jon C. Thomas seeking review of three separate Final Partnership Administrative Adjustments (FPAA) under 26 U.S.C. § 6226 issued to the following three separate partnerships: Rhineland Cattle Partners, Ltd. (RCP Ltd.), Rhineland Cattle Partners II (RCP II) and Rhineland Cattle Partners III (RCP III). On December 28, 1987, the Internal Revenue Service (IRS) issued three separate FPAA notices

to plaintiff as the tax matters partner for RCP Ltd., RCP II and RCP III. Plaintiff originally filed the following civil actions: Cause No. 88–0531C(5) on behalf of RCP Ltd. for a review of the FPAA determination relating to taxable year 1982; Cause No. 88–0530C(3) on behalf of RCP II for a review of the FPAA determination relating to taxable years 1983 and 1984; and Cause No. 88–0529C(6) on behalf of RCP III for a review of the FPAA determination relating to taxable year 1984. On October 5, 1988, this Court entered an order consolidating the three separate civil actions filed by plaintiff contesting the FPAA notices issued by the IRS.

2. Plaintiff raised between five and twenty head of Hereford cattle, using natural breeding, during his college years, and this was his only previous cattle breeding experience prior to the formation of the cattle breeding partnerships with Timothy L. Rhine in 1982. Plaintiff had no prior experience managing a cattle breeding partnership or formal education related to cattle or cattle embryo transplants prior to the formation of the partnerships at issue here. As a result of plaintiff's limited experience in the cattle industry, plaintiff relied on Rhine as his primary source of information and expertise for the cattle breeding partnerships. Rhine also sold plaintiff the recipients and the embryos for the partnerships.

3. In the summer of 1982, plaintiff and Rhine agreed to form a cattle breeding partnership with plaintiff serving as general partner and tax matters partner and Rhine serving as herd manager. To prepare for the formation of the RCP Ltd. cattle breeding partnership in November of 1982, plaintiff reviewed scientific and economic information on the cattle industry and visited Rhineland Ranch two or three times. RCP II was formally instituted in October of 1983, and RCP III was formally instituted in October of 1984 with plaintiff serving as the eventual general partner and tax matters partner for each partnership. Rhine was the herd manager for each partnership. For serving in the capacity as herd manager for the three herds, Rhine received $1,200.00 per cow per year

in the initial partnership herd from RCP Ltd. and $1,500.00 per cow per year in the initial partnership herd from RCP II and RCP III. Under the consulting agreement between plaintiff and Rhine, plaintiff paid Rhine $100.00 and half of his back-end profits. The three partnerships were projected to be in operation for thirty-six months and to sell their herds within three years of partnership formation. All three partnerships started operations in the last week of the relevant tax year. Plaintiff, not Rhine, decided the business plan and the structure of RCP Ltd., RCP II and RCP III.

4. The private placement memoranda for RCP Ltd., RCP II and RCP III were prepared under the direction of plaintiff as general partner for the three partnerships and were reviewed by him prior to issuance. The private placement memoranda for the three partnerships contained essentially the same information. Although the three private placement memoranda specifically provided that "partnership breeding operations will be conducted at Rhineland Ranch," the cattle for the three herds were maintained at a number of locations, some of the locations were only leased by Rhine and one, Alberta Livestock Transplants, was neither owned nor leased by him. The three programs were designed so that the herds would be formed by transplanting embryos from full blood Simmental and Simbrah cattle into purebred recipient cows. After the formation of the three partnerships, the three herds were designed to grow through the rebreeding of the original recipient cows, also known as the process of calving, and not through the purchase of additional cows or new embryo transplants. The rebreeding of the original recipient cows was important to the objectives of the three partnerships, because the herds were designed to grow via rebreeding of the original recipient purebred cows. The partnerships did not purchase additional Simmental heifers, embryos or semen after the original purchase of the embryos and recipients.

5. The designation of full blood for Simmental cattle means that the animal is of

foreign ancestry or whose direct parents were of foreign ancestry on both sides. The designation of purebred for Simmental cattle means that if the cow is female, it is seven-eighths Simmental, and if the cow is male, it is fifteen/sixteenths Simmental.

6. In violation of the private placement memoranda provision requiring that the recipient cattle be purebred or full blood Simmental, except to the extent of certain provisions of the memorandum for RCP III and the sales agreement executed on December 30, 1982 between RCP Ltd. and Rhine, thirty-six of the fifty-five recipient cattle Rhine sold to RCP Ltd. were seventy-five per cent Simmental and two were only fifty per cent Simmental. An important goal for the RCP Ltd. partnership was for the recipient cows to be purebred inasmuch as after the first generation of embryo transplant calves was born the partnership intended the cattle herd to grow solely through rebreeding the original recipient cattle, either through natural service or artificial insemination. Records of RCP Ltd. indicate that of those fifty-five cows listed with dates of birth prior to December 1982, none was full blood Simmental. Consequently, thirty-eight of the fifty-five cows were not purebred and none was full blood Simmental. In fact, the sales contract dated December 30, 1982 between plaintiff and Rhine concerning RCP Ltd. did not include the number of recipient cattle and embryos to be purchased, because at the time this sales contract was executed, Rhine did not own the cattle he was purporting to sell to RCP Ltd. Plaintiff purchased the recipient cattle for RCP Ltd. from Rhine for $4,300.00 per embryo transplant unit even though Rhine paid Longcrier Farms $2,750.00 per embryo transplant unit. Although the sales agreement provided in relevant part that "seller hereby agrees to perform all necessary services and operations to transplant the embryos purchased by purchaser . . . into the recipient cattle also purchased by purchaser," Rhine did not perform nor supervise any of the embryo transplant operations for the original generation of the RCP Ltd. herd nor were the transplant operations performed at Rhineland Ranch

as required by the original sales contract. The certificate of limited partnership for RCP Ltd. filed with the State of Missouri listed Rhine as the general partner along with plaintiff. Rhine testified that his signature was forged on the certificate.

7. Rhine made an arrangement with Alberta Livestock Transplants to transplant the embryos for RCP II and this arrangement produced poor results. RCP II experienced only an eighty per cent success rate for embryo transplant calves over a two year period.

8. A heifer calf must be fifteen months old before the calf can carry an embryo.

9. Plaintiff did not personally inspect the initial recipient cows and embryos purchased by RCP III prior to or contemporaneous with their purchase. The partnership purchased from Rhine and Rhine Associates embryos from full blood Simmental and Simbrah donors implanted into purebred recipient animals for $4,300.00 each. RCP III purchased ninety-five embryos from Rhine in 1984 but only eleven of the ninety-five embryo transplants performed in 1984 resulted in live births and only eighty-one calves were ever produced for RCP III as a result of embryo transplants. Only twelve full blood animals were ever produced by RCP III during its entire existence. Records of the partnership indicate that twenty-nine of the ninety-five recipients purchased by RCP III in December 1984 were less than fifteen months old and were too young to carry an embryo transplant in contradiction of the business structure requiring that the embryos would be transplanted into the partnership's recipient cattle.

10. Plaintiff failed to produce at trial any sales contracts for RCP II and RCP III or any subsequent sales contracts for RCP Ltd.

11. The partnership unit for all three partnerships required a total investment of $55,000.00, consisting of a $5,500.00 cash investment and a recourse note secured by a letter of credit for $49,500.00 due at the end of the partnership. Under the recourse note, the investors were personally

liable for payment of the note. Plaintiff owned two and one-half units as a limited partner.

12. Plaintiff is currently president and sole shareholder in Intermark Securities, Inc. (ISI). At the time of the partnerships' operations, plaintiff owned fifty per cent of ISI and he was vice president and registered principal of ISI. ISI's only revenues during the 1982–1984 period resulted from payments from RCP Ltd., RCP II and RCP III. ISI also received a wholesaling commission from the three partnerships of two per cent of the total subscription proceeds for all the units sold in the partnerships no matter if they were sold by ISI or another broker-dealer.

13. Even though the industry standard for sales commissions to broker-dealers ranged down as low as eight per cent and as high as ten per cent, plaintiff paid a ten per cent sales commission to broker-dealers who sold limited partnership units in the cattle partnerships.

14. Plaintiff is currently and has always been president and sole owner of Intermark Assets Group (IAG), a real estate syndication management business having no other dealings with cattle partnerships outside of the three at issue here. Plaintiff designed all three partnerships to pay a wholesaling fee to IAG for arranging financing in the amount of two per cent of the loan procured by or on behalf of the partnerships. Moreover, RCP Ltd. paid a financial consulting fee to IAG. IAG produced documents entitled "Summary of Offering" for both RCP II and RCP III in which a section labelled "Substantial Write–Offs" provided as follows: "as a result of substantial write-offs, each investor should receive tax benefits exceeding his cash investment".

15. In December 1982, plaintiff received a general partner's salary from RCP Ltd. of $5,685.00. In December 1982, RCP Ltd. paid $55,000.00 in sales commissions and $12,100.00 in wholesaling fees to ISI and $16,315.00 in consulting fees to IAG. The financial projections for RCP Ltd. projected a net income of $2,956.00, a less than one per cent return on the investment.

16. In December 1983, RCP II paid plaintiff a general partner's salary of $140,000.00. Plaintiff testified that in his real estate partnerships his general partner's fee ranged between $25,000.00 and $50,000.00 on partnerships with similar or even larger contributed capital. In December 1983, RCP II paid $280,500.00 in sales commissions and $61,600.00 in wholesaling fees to ISI and $55,440.00 as a financial assistance fee to IAG. The financial projections for RCP II projected a net loss for the partnership entity of $108,851.00.

17. In December 1984, RCP III paid plaintiff a general partner's salary of $47,500.00 and IAG a financing fee of $18,810.00. In January 1985, RCP III paid ISI a sales commission of $104,900.00 and wholesaling fees of $20,000.00. The financial projections projected a net loss for the partnership entity of $213,537.00.

18. The sales commissions, wholesaling fees, financial assistance fees and financial consulting fees paid by the three partnerships to entities controlled by plaintiff and the general partner's salary paid directly to plaintiff were all paid at the closing of the offering of the partnerships prior to the commencement of partnership operations and without regard to the financial performance of the partnerships.

19. Price Waterhouse created the financial projections for RCP Ltd. and RCP II based on assumptions provided by plaintiff, and plaintiff reviewed those projections prior to the projections being released. Plaintiff or his agents provided Price Waterhouse with management projections in the form of computer runs and plaintiff was solely responsible for the assumptions provided in these computer runs. When preparing the projections for RCP Ltd., Price Waterhouse relied on the computer runs and the sales price projections utilized in the projections. Touche Ross & Company (Touche Ross) created the financial projections for RCP III based on assumptions provided by plaintiff, and plaintiff reviewed those projections prior to the projections being released. Plaintiff and his agents provided Touche Ross with computer runs, plaintiff's assumptions for RCP III and the

sales price projections. The financial projections for RCP Ltd., RCP II and RCP III were premised on the relevant herd growth charts. The category prices contained in the base case computer runs for the three partnerships were the same. After 1985 there was no one auditing the partnerships in conformity with generally accepted auditing principles.

20. The computer runs provided by plaintiff to the accountants provided that all bred embryo transplant heifers would sell for $9,800.00 each. Although the computer run containing plaintiff's assumed sales prices used in the financial projections assumed that all eleven twelve month-old heifers would sell for $9,800.00 each, plaintiff admitted that he has never seen eleven twelve month-old bred heifers and that it would be extremely unlikely that one could bred a twelve month-old heifer.

21. Although plaintiff testified that the sales prices used in the projections after 1982 were based on information up to and including the date of that particular partnership, the sales prices assumed in the projections were not adjusted for any of the three partnerships and no such price data was turned over to the accountants.

22. One of defendant's experts, Dr. Ernst Davis, a livestock marketing economist at Texas A & M University, testified that the original financial projections for the three partnerships used unrealistically high prices that were not representative of the Simmental market in 1982. He stated that the $9,800.00 used for a projected sale price for bred heifers in each of the partnerships was statistically higher than other sale prices reported in *The Simmental Shield*. He testified that the actual average full blood sale price for bred heifers in 1982 was $4,900.00. He further testified that the use of the $9,800.00 high-end full blood price was unreasonable in light of the intent of all three partnerships to maximize their herd numbers for the planned dispersal sales, because such planning would minimize culling and consequently dilute the expected genetic stock of the herds which would reduce the quality of the cattle and reduce their expected prices. Dr. Davis

concluded that if the adjusted average bred heifer price of $4,900.00 was used rather than the $9,800.00 figure in the chart prepared by Rhine's wife and the financial projections for each partnership, all three partnerships should have projected even greater losses.

23. Trent Chambers, a partner in the accounting firm of Price Waterhouse and the accountant in charge of the RCP Ltd. and RCP II projections, testified that the financial projections were not financial forecasts and the projections were "the primary projection statements that were mutually agreed upon to be used as such by general partner and ourselves." Chambers further testified that he undertook a thorough "review of management assumptions and the evaluation and support underlying those assumptions." Plaintiff testified that he provided Chambers with sales price information in addition to a chart prepared by Rhine's wife so that Chambers could determine the reasonableness of plaintiff's sales price assumptions. The chart prepared by Rhine's wife listed only full blood prices even though the cattle partnerships had purebred and non-purebred animals in their herds. Chambers testified that this was the only back-up data he received.

24. Frank Richter, a certified public accountant, produced charts at trial showing that only forty-eight of the two hundred twenty-five cattle produced by RCP Ltd, only three hundred six of the one thousand twenty-six cattle produced by RCP II and only twelve of the two hundred eighty-nine cattle produced by RCP III were full blood. He stopped auditing plaintiff's financial statements for the partnerships after 1985 and his work papers after that time were just for tax returns. After 1985 plaintiff decided to omit substantially all financial statement disclosures and a statement of changes in financial position required by generally accepted accounting principles.

25. Patrick Stark, the accountant in charge of the RCP III projections prepared by Touche Ross, testified that plaintiff requested a compilation of projections, management's numbers and that assumptions be prepared for RCP III. As ex-

plained by Stark, the compilation of projections is merely the taking of a set of assumptions furnished by the general partner, in this case plaintiff, summarizing them on a sheet of paper, reviewing them for reasonableness taking into account what a reasonable man might think would happen but not independently verifying all these assumptions, and then summarizing them so that a potential investor could determine what return he might expect if he made such an investment. Stark also testified that this process subjects the numbers and assumptions to a less rigorous level of review.

26. Contained within the confidential private placement memoranda for RCP Ltd., RCP II and RCP III are the herd growth charts created by plaintiff. The herd growth charts represented the herd growth assumptions used to prepare the financial projections for RCP Ltd., RCP II and RCP III.

27. Plaintiff testified that the death rates he incorporated into the financial projections reportedly reflected industry averages and that he based his rates from his conversations with Rhine and his own personal research. Plaintiff admitted that the herd growth charts failed to include all of the contingent possibilities that could have happened during the period of time the partnerships were in operation.

28. Rhine testified that if Chambers or Stark had asked him to provide assumptions for the financial projections, he would have cited to them the industry averages. He also testified that at his Rhineland Ranch he consolidated cattle he managed for the three limited partnerships with cattle he managed for individuals.

29. Although the second generation of calves to be born to RCP Ltd. and all generations of RCP II and RCP III projected a ninety-five per cent calving rate, Rhine had never achieved a ninety-five per cent calving rate on a large group of cattle. Rhine testified that "no one weans a ninety per cent calf crop on natural calves, much less on embryo transplant," and he never represented to plaintiff that he could perform any better than the industry average

with respect to herd growth. Rhine testified as to the following reasonable projections of death rates in cattle herds: a ten to fifteen per cent death rate from time of pregnancy check to five days after birth, a five to ten per cent rate from five days after birth until weaning, a two to three per cent death rate from weaning until one year, a one per cent death rate from over one year to two years of age and a one-half per cent death rate for animals over two years old. Rhine further testified as to the following reasonable average culling rates for a registered breeding herd: twenty per cent at weaning for heifer calves, fifteen per cent at weaning for bull calves, five per cent at twelve months of age for heifer calves and ten to fifteen per cent for heifer calves prior to pregnancy check.

30. Rhine testified that although plaintiff received the foregoing culling rates and such averages were expected to be applied to the three partnerships at issue here, no culling assumptions were included in any of the herd growth charts.

31. The only assumptions contained in the herd growth chart for RCP Ltd. were a ten per cent projected death loss for the first generation of calves and a five per cent loss for subsequent generations. The herd growth chart failed to include minimal allowances for industry averages attributable to calf deaths, cow deaths, abortion losses, culling and the lower prices that should have been assumed for selling culled animals. RCP Ltd. was not projected to make a profit in the first three years of operation, but, instead, the partnership's profit was to be made via a herd disposition sale. The herd growth chart projected a total of two hundred thirteen animals available for sale at the time for disposition.

32. The only assumption contained in the herd growth charts for RCP II was a five per cent death loss for all generations of calves to be born to the partnership. The herd growth chart failed to include minimal allowances for industry averages attributable to calf deaths, cow deaths, abortion losses and culling. RCP II was not projected to make a profit in the first three years of operation, but, instead, the

partnership's profit was to be made via a herd disposition sale. The herd growth chart projected a total of two hundred ninety animals available for sale at the time for disposition.

33. The only assumption contained in the herd growth charts for RCP III was a five per cent death loss for all generations of calves to be born to the partnership. The herd growth chart failed to include minimal allowances for industry averages attributable to calf deaths, cow deaths, abortion losses and culling. RCP III was not projected to make a profit in the first three years of operation, but, instead, the partnership's profit was to be made via a herd disposition sale. The herd growth chart projected a total of five hundred eighty animals available for sale at the time for disposition.

34. One of defendant's experts, Dr. Raymond Dietrich, an associate professor in the department of agriculture economics at Texas A & M University, testified that if minimal allowances had been made for accepted industry averages, the projected herd numbers for RCP Ltd., RCP II and RCP III would have been radically altered. He further testified that the financial impact of not including assumptions for death losses, culling and calving losses would have dramatically decreased the number of animals available for the herd disposition sales for the three partnerships. Moreover, he testified that the financial projections for RCP Ltd., RCP II and RCP III were based on relevant herd growth charts, but these herd growth charts failed to make any allowances for industry loss assumptions such as death losses or culling or for the lower sales prices that should have been assumed for selling culled animals in the case of RCP Ltd. Dr. Dietrich concluded that if the financial projections based on the herd growth charts for the three partnerships had included culling, death loss and calving loss assumptions, net losses should have been projected for all three partnerships.

35. Dr. Randall Grooms, plaintiff's expert, testified that the herd growth charts for the three partnerships were reasonable even though the charts failed to include any allowances for herd death losses or culling averages. In his testimony he conceded that the Department of Agriculture's calving averages of eighty to eighty-five per cent were reliable even though he agreed that the herd growth charts all assumed calving averages of ninety to ninety-five per cent. He also testified that the financial projections for each of the partnerships were reasonable. Dr. Grooms further testified that the Rhineland Ranch records kept by Rhine showed management control and that the quality of cattle present at Rhineland Ranch indicated that it was a first class operation. He further stated that there was good quality control at the Rhineland Ranch.

36. Plaintiff testified that after 1985 he forced Rhine into major concessions. The first written complaint made to Rhine evidenced by plaintiff was a letter dated April 25, 1985, and plaintiff produced no further evidence of his corresponding with Rhine until almost a year later, on March 10, 1986. In the last paragraph of this letter, plaintiff stressed that the herds' performance "will cost the partnership(s) and probably me a considerable amount of money." Even as of March 10, 1986, the evidence shows that plaintiff and Rhine had failed to resolve their dispute over partnership performance. In the interim between the two letters, the IRS started an audit of plaintiff's cattle partnerships. Although plaintiff testified that Rhine made commitments to atone for the poor performance of the partnerships, none was reduced to writing. Rhine testified that he never transferred any cattle in his records to the Rhineland Cattle Partnership ownership codes.

37. The three partnerships have no record as to the ultimate disposition of fifty-nine of the embryo transplant calves born to the partnerships and as to the amount for which twenty-two of the embryo calves were sold.

38. At plaintiff's recommendation, the limited partners of RCP Ltd. voted to extend the partnership in 1985 and 1986, and the limited partners of RCP II voted to extend that partnership in 1986. More-

over, the limited partners of RCP Ltd. by agreement voluntarily contributed additional funds into the partnership on several occasions in order to cover partnership debts. The limited partners have filed suit in state circuit court alleging that plaintiff misled them into approving the extensions and misrepresented the terms under which the partners would make additional contributions.

39. The goal of the partnerships was to sell the maximum number of cattle at the time of herd dispersal.

40. The bill of sale for RCP Ltd. shows that the partnership experienced negative growth and had only forty-six animals at the herd dispersal sale even though the partnership started with fifty-five recipients and embryos. Plaintiff sold the RCP Ltd. and RCP II herds and attempted to sell the RCP III herds to Eldon Walter, Rhine's accountant. In fact Rhine placed Walter in touch with plaintiff, and he testified that this was the limit of his marketing and promotion of the herds. Although plaintiff testified that Walter paid additional compensation for the RCP Ltd. and RCP II herds beyond what was contained in the sale and purchase agreement and bills of sale for RCP Ltd. and RCP II, the contracts did not provide for such an arrangement. The contracts specifically covenanted that title was being transferred free and clear of all liens and any encumbrances to the cattle and that the conditions in the price categories on the contracts were true and accurate. Moreover, Dr. Davis testified that such alleged additional payments were not reflected on the partnerships' 1987 income tax returns as required by law.

41. Rhine reduced the amount owed on his herd maintenance fees for RCP Ltd. and RCP II upon dispersal of the herds because there were not sufficient proceeds from the sale to cover all the partnerships' debts.

42. Dr. Davis testified that the 1987 sale prices as to both RCP Ltd. and RCP II actually achieved for both full bloods and purebreds were significantly lower than the average prices in the Simmental market at that time as substantiated by the 1987 sale price information contained in the American Simmental Association chart. The American Simmental Association's prices included both full blood and purebred sales. He further concluded that even if the average sale prices developed from *The Register* for 1987 were reduced by thirty per cent to compensate for the increased costs of an auction rather than a private sale, those average prices would still be higher than the prices actually received by RCP Ltd. and RCP II in the private treaty sale to Sha–Ron Farms.

43. At trial, there was no evidence presented showing that RCP III cattle were sold in a dispersal sale even though the partnership's admitted business plan was to sell all of its cattle at the end of the three year business plan in a herd dispersal sale. Rhine offered to reduce his maintenance fees as to RCP III, but the bank refused to cooperate and consequently he eventually foreclosed agister liens on the herd. Thereafter the bank sued plaintiff personally and had summary judgment entered against him in the amount of $150,000.00.

44. Rhine and Dr. Grooms testified that the 1986 dairy buyout caused the losses incurred by the partnerships. However, Dr. Davis, a specialist in livestock marketing comprises, testified that the buy-out had no continued impact on prices in 1987, the year in which the RCP Ltd. and RCP II herds were sold.

45. Rhine and Dr. Grooms also testified that an abnormal cattle cycle caused the losses incurred by RCP Ltd., RCP II and RCP III. In contrast, Dr. Davis testified that even if the cattle cycle beginning in 1979 was not abnormal, 1982 was the fourth year of herd build-up and by 1985 the cycle would have been expected to have already turned into the liquidation phase, meaning that the prices would be decreasing. Dr. Davis further explained that by the time the RCP II and RCP III partnerships began operations the downturn in the cattle cycle already was evident through decreased inventory numbers. Anyone with a background in agriculture economics

should not have made a recommendation to start a registered purebred operation after 1983, because this would have been a high-risk time. Rhine testified that this time period was a good time to begin a registered operation because during any period of decreasing commercial cattle prices limited resources are redirected to improving genetic stock.

46. Plaintiff spent five working days per quarter, or twenty days per year, planning and reviewing the activities of the three partnerships. At the time of RCP III's formation in 1984, he was acting as general partner in ten other partnerships and these commitments often required his involvement on a daily basis. In addition to the aforementioned commitments, plaintiff attended six to nine auctions or shows with Rhine between 1983 and 1985 and during this time they also had individual investments in cattle, some of which were common investments.

47. All three partnerships at issue here lost money in every year of their operations.

48. In taxable year 1982 RCP Ltd. claimed a total ordinary loss on its 1982 Partnership Income Tax Return, Form 1065 in the amount of $213,146.00, allocated as follows:

|       |                     |              |
|-------|---------------------|--------------|
| (i)   | Maintenance fees    | $5,500.00    |
| (ii)  | Breeding fees       | $181,500.00  |
| (iii) | Depreciation        | $344.00      |
| (iv)  | Guaranteed payments | $20,000.00   |

(Although plaintiff claimed $20,000.00 in his complaint, discovery undertaken during this cause of action indicates that only $5,565.00 in guaranteed payments actually were made to RCP Ltd. in 1982.)

|       |                   |           |
|-------|-------------------|-----------|
| (v)   | Interest Expenses | $217.00   |
| (vi)  | Other deductions  | $5,585.00 |

(Accounting fees of $5,000.00, financing and consulting fees of $544.00 and amortization of $41.00.)

Total Tax Losses Claimed    $213,146.00

49. On December 28, 1987, the Internal Revenue Service issued a timely notice of Final Partnership Administrative Adjustment disallowing the entire $213,146.00 in ordinary losses reported by RCP Ltd. on its 1982 Partnership Income Tax Return, Form 1065.

50. In taxable year 1983 RCP II claimed a total ordinary loss on its 1983 Partnership Income Tax Return, Form 1065 in the amount of $827,946.00 allocated as follows:

|       |                                                                              |              |
|-------|------------------------------------------------------------------------------|--------------|
| (i)   | Maintenance fees                                                             | $35,000.00   |
| (ii)  | Freight costs                                                                | $56,000.00   |
| (iii) | Breeding fees                                                                | $588,000.00  |
| (iv)  | Guaranteed payments (General partner's salary)                               | $140,000.00  |
| (v)   | Depreciation                                                                 | $1,663.00    |
| (vi)  | Other deductions (accounting fees of $5,000.00 and amortization of $2,283.00) | $7,283.00    |

Total Tax Losses Claimed    $827,946.00

51. In taxable year 1983, RCP II also claimed property qualifying for an investment tax credit of $140,000.00 on its 1983 Partnership Income Tax Return, Form 1065.

52. On December 28, 1987, the Internal Revenue Service issued a timely notice of Final Partnership Administrative Adjustment disallowing the entire $827,946.00 in ordinary losses reported by RCP II on its 1983 Partnership Income Tax Return, Form 1065 and disallowing the claimed property qualifying for an investment tax credit of $140,000.00.

53. On December 28, 1987, the Internal Revenue Service issued a timely notice of Final Partnership Administrative Adjustment II on its 1983 Partnership Income Tax Return, Form 1065 and disallowing the claimed property qualifying for investment tax credit of $140,000.00.

54. In taxable year 1984 RCP II claimed a total ordinary loss on its 1984 Partnership Income Tax Return, Form 1065 in the amount of $669,846.00 allocated as follows:

|       |                                                        |             |
|-------|--------------------------------------------------------|-------------|
| (i)   | Maintenance fees                                       | $385,000.00 |
| (ii)  | Depreciation                                           | $19,763.00  |
| (iii) | Interest Expenses                                      | $230,061.00 |
| (iv)  | Other deductions (amortization)                        | $27,397.00  |
| (v)   | Professional fees                                      | $4,063.00   |
| (vi)  | Form 4797 losses (ordinary loss resulting from sale of cattle) | $3,562.00   |

Total Tax Losses Claimed    $669,846.00

55. In taxable year 1984, RCP II also claimed property qualifying for an investment tax credit recapture of $6,500.00 on its 1984 Partnership Income Tax Return, Form 1065.

56. On December 28, 1987, the Internal Revenue Service issued a timely notice of Final Partnership Administrative Adjustment disallowing the entire $669,846.00 in ordinary losses and the $6,500.00 in investment tax credit recapture reported by RCP II on its 1984 Partnership Income Tax Return, Form 1065.

57. In taxable year 1984 RCP III claimed a total ordinary loss on its 1984 Partnership Income Tax Return, Form 1065 in the amount of $278,756.00 allocated as follows:

| | | |
|---|---|---|
| (i) | Depreciation | $630.00 |
| (ii) | Other deductions | $236,136.00 |
| | costs of embryo transplants | $199,500.00 |
| | transportation | $19,000.00 |
| | herd maintenance | $11,875.00 |
| | professional fees | $5,000.00 |
| | amortization | $553.00 |
| | (pre-paid financing fees) | |
| | amortization | $208.00 |
| | (organizational costs) | |
| | Total other deductions | $236,136.00 |
| (iii) | Guaranteed payment | $41,990.00 |

Total Tax Losses Claimed $278,756.00

58. In taxable year 1984, RCP III also claimed property qualifying for an investment tax credit of $53,010.00 on its 1984 Partnership Income Tax Return, Form 1065.

59. On December 28, 1987, the Internal Revenue Service issued a timely notice of Final Partnership Administrative Adjustment disallowing the entire $278,756.00 in ordinary losses and the $53,010.00 in claimed property qualifying for an investment tax credit recapture reported by RCP III on its 1984 Partnership Income Tax Return, Form 1065.d

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action under 26 U.S.C. § 6226 pursuant to 28 U.S.C. § 1346(e).

2. Plaintiff, the taxpayer, bears the burden of proving the essential facts establishing that RCP Ltd., RCP II and RCP III were all formed with a profit motive. *See Laurel Hill Cemetery Ass'n v. United States,* 427 F.Supp. 679, 690 (E.D.Mo.1977), *aff'd,* 566 F.2d 630 (8th Cir.1977); *Simon v. Commissioner,* 830 F.2d 499, 501 (3d Cir. 1987).

3. Sections 162 and 212 of the Internal Revenue Code, 26 U.S.C. §§ 162 and 212, allow the deduction of all ordinary and necessary expenses paid or incurred during the taxable year in the carrying on of a trade or business or incurred in an activity for the production of income. The application of these sections is limited to those activities which are engaged in with a bona fide objective of realizing a profit or an actual and honest objective of making a profit. 26 U.S.C. § 183; *Dreicer v. Commissioner,* 78 T.C. 642, 645 (1982), *aff'd without opinion,* 702 F.2d 1205 (D.C.Cir. 1983); *Independent Elec. Supply, Inc. v. Commissioner,* 781 F.2d 724, 725 (9th Cir. 1986); *Brannen v. Commissioner,* 78 T.C. 471, 479 (1982), *aff'd,* 722 F.2d 695 (11th Cir.1984). "The standard test for the existence of a trade or business for purposes of § 162 is whether the activity 'was entered into with the dominant hope and intent of realizing a profit.'" *United States v. American Bar Endowment,* 477 U.S. 105, 110 n. 1, 106 S.Ct. 2426, 2430 n. 1, 91 L.Ed.2d 89 (1986) (quoting *Brannen,* 722 F.2d at 704)) (citation omitted).

4. Sections 38 and 48 of the Internal Revenue Code, 26 U.S.C. §§ 38 and 48, permit taxpayers to claim an investment tax credit, assuming all statutory conditions are met, with respect to depreciable property. Depreciable property is defined as property used in a trade or business or held for the production of income. 26 U.S.C. § 167(a). The availability of the investment tax credits turns on the presence of a trade or business or good-faith profit motive. *Hagler v. Commissioner,* 86 T.C. 598, 622 (1986). To constitute the carrying on of trade or business or to establish the intent to produce income, the activity must have been engaged in or the expenditure must have been made, with the primary and predominant purpose and objective of

making a profit. *Independent Elec. Supply, Inc.*, 781 F.2d at 726; *Surloff v. Commissioner*, 81 T.C. 210, 232–33 (1983).

5. In order to take a deduction for expenses in carrying out a trade or business, the taxpayer must have entered into the venture with the primary and predominant purpose and objective of making a profit. *Simon v. Commissioner*, 830 F.2d at 500 (citing *Thomas v. Commissioner*, 792 F.2d 1256, 1259 (4th Cir.1986) and *Tallal v. Commissioner*, 778 F.2d 275, 276 (5th Cir.1985)); *United States v. American Bar Endowment*, 477 U.S. 105, 110 n. 1, 106 S.Ct. 2426, 2429 n. 1, 91 L.Ed.2d 89 (1986) (quoting *Brannen*, 722 F.2d at 704)); *Independent Elec. Supply, Inc.*, 781 F.2d at 726 (quoting *Hirsch v. Commissioner*, 315 F.2d 731, 736 (9th Cir.1963)); *Zell v. Commissioner*, 763 F.2d 1139, 1142 (10th Cir.1985); *Eastman v. United States*, 225 Ct.Cl. 298, 635 F.2d 833, 837 (1980). Primary is defined as meaning of first importance or principally and profit as meaning economic profit or profit independent of tax savings. *Simon*, 830 F.2d at 500; *Paul E. Marshall*, 57 T.C.M. (P–H) para. 88,524 (1988). The Eighth Circuit Court of Appeals agreed that a profit motive is a prerequisite to deductibility under 26 U.S.C. § 162(a). *Five Lakes Outing Club v. United States*, 468 F.2d 443, 445 (8th Cir.1972). *See Clevenger v. Weinberger*, 375 F.Supp. 821, 825 (W.D.Mo.1974) ("in order to be a 'trade or business' within the meaning of . . . 26 U.S.C. § 162 (1970), an enterprise must be profit-motivated and that motive must be the principal or dominant motive for the enterprise") (citations omitted).

6. The determination of profit motive must be at the partnership level. *Hagler*, 86 T.C. at 622. The partnership is regarded as an independently recognizable entity apart from the aggregate of its partners for the purpose of computing income and deductions. *Brannen*, 722 F.2d at 703 (quoting *United States v. Basye*, 410 U.S. 441, 448, 93 S.Ct. 1080, 1085, 35 L.Ed.2d 412 (1973)).

7. The focus of the partnership's profit motive is determined by examining the motivation of the promoter and general partners of the partnership. *Hagler*, 86 T.C. at 622; *Surloff*, 81 T.C. at 233. Since the conduct of the partnerships' affairs was left to the general partner, in this case plaintiff, the Court must focus upon his knowledge, conduct, expertise and success in the cattle breeding field as well as any other factor which he relied upon in making partnership decisions when determining the profit intent of the limited partnerships at issue here. *John Deegan*, 54 T.C.M. (P–H) para. 85,219 (1985), *aff'd*, 787 F.2d 825 (2d Cir.1986); *Brannen*, 78 T.C. at 505.

8. The determination of whether plaintiff possessed the requisite profit motive is a question of fact to be resolved on the basis of all the facts and circumstances, and the burden of proof is on plaintiff. *Simon*, 830 F.2d at 501. Although no one factor is determinative, objective facts are accorded greater weight than mere statements of intent. *John Deegan*, 54 T.C.M. at (P–H) para. 85,219; *Warren Roy Tolson*, 54 T.C.M. (CCH) 1132, 1137 (1987).

9. The conclusion that an investment would not turn a profit even if it performed as projected is dispositive of profit motive. *Deegan*, 787 F.2d at 826 n. 3. The Court finds that if RCP II and RCP III had performed as the partnerships had been projected to perform in the base case projections, these partnerships would have incurred losses. The Court therefore finds that plaintiff, having knowledge of the projections, knew that even if the partnerships had performed as he projected, the partnerships would lose money. Consequently, the Court finds that plaintiff did not have profit motive at the partnership level in forming and operating RCP II and RCP III.

10. Moreover, the Court finds that plaintiff was aware of or should have been aware that the financial projections for all three partnerships were unreasonably optimistic, in that the projections assumed low death rates, no culling losses and inflated prices for the cattle at herd dispersal sales. Based on these slanted projections, the Court concludes that plaintiff fully expected the partnerships to produce net losses

greater than those produced on the financial projections. Consequently, the Court finds that plaintiff did not have economic profit motive at the partnership level in forming and operating RCP Ltd., RCP II and RCP III.

11. The Court further finds that plaintiff's primary motive in forming and operating the three partnerships at issue were the large general partner fees, sales commissions, wholesaling fees and financial assistance and consulting fees paid by the partnerships to plaintiff directly and to entities in which he had substantial interests.

12. Section 1.183–2(b), Income Tax Regulations, lists some of the relevant factors to be considered by the courts in determining whether a profit motive exists, but all of the listed factors do not necessarily apply in every case and only the applicable factors need to be addressed. *Paul E. Marshall*, 57 T.C.M. (P–H) at para. 88,524. The Eleventh Circuit has specifically found the following:

> Although Section 183 technically does not come into play until after it has been determined that the activity in question was not being carried on for a profit within the meaning of Section 162, the courts have relied upon the factors set forth in Section 183 in making the requisite profit motive analysis under Section 162.

*Brannen*, 722 F.2d at 704.

13. The following are the list of factors to be considered in determining the existence of a profit motive set forth in Section 183, Income Tax Regulations:

(1) manner in which the taxpayer carries on the activity;

(2) the expertise of the taxpayer or his advisors;

(3) the time and effort expended by the taxpayer in carrying on the activity;

(4) expectation that assets used in the activity may appreciate in value;

(5) the success of the taxpayer in carrying on other similar or dissimilar activities;

(6) the taxpayer's history of income or losses with respect to the activity;

(7) the amount of occasional profits, if any, which are earned;

(8) the financial status of the taxpayer; and

(9) elements of personal pleasure or recreation.

Treas.Regs. Section 1.183–2(b). This list is nonexclusive and no one factor is determinative. *Id.; Eastman*, 635 F.2d at 838.

14. The Court finds that plaintiff did not operate the partnerships in a businesslike manner. He repeatedly engaged in unbusinesslike activities such as his decision to purchase non-purebred recipients for RCP Ltd., his decision to purchase the recipient cattle from the herd manager, Rhine, his decision to execute the sales contract dated December 30, 1982 without specifying the number of recipients and embryos to be purchased, and his decision to allow embryo transplant operations to be performed outside of the herd manager's ranch in violation of the original sale contract. Moreover, his decision not to have the partnerships audited in conformity with generally accepted auditing principles after 1985 and his poor record-keeping practices of the partnerships further demonstrate that plaintiff engaged in unbusinesslike activities while running the partnerships. Even if the partnerships were operated in a business-like manner, as plaintiff attempted to establish, evidence of this alone is insufficient to establish the requisite profit motive. *Sutton v. Commissioner*, 84 T.C. 210, 225 (1985), *aff'd*, 788 F.2d 695 (11th Cir.1986).

15. The Court further finds that plaintiff had minimal expertise in the cattle breeding area prior to the formation of the three partnerships. As a result, plaintiff relied on Rhine as his primary source of information concerning the operation of the three partnerships and the anticipated sales prices for the herds even though Rhine sold the initial embryos and recipients to the three partnerships. Furthermore, a partnership's reliance on the seller for information concerning the value of the assets acquired by the partnership is recognized as being a poor business practice and demonstrates a lack of arms-length bargaining

between the parties. *Hagler,* 86 T.C. at 623–24; *Estate of Baron v. Commissioner,* 83 T.C. 542, 555–56 (1984), *aff'd,* 798 F.2d 65 (2d Cir.1986). The Court finds that plaintiff's reliance on Rhine for information concerning the ultimate sales price of the herd also demonstrated a poor business practice and a lack of profit motive. While a partnership may rely on the expertise of third parties to carry out normal duties and responsibilities associated with the income-generating operations of the partnership, the care with which the general partner oversees the performance of the duties of the third parties and the prudence he exercises in assigning the duties are of heightened importance. *Flowers v. Commissioner,* 80 T.C. 914, 932 (1983).

16. The Court finds that plaintiff devoted minimal time and effort to the running of the three partnerships at issue here.

17. The Court further finds that the opinions and analyses of defendant's experts, Dr. Davis and Dr. Dietrich, are entitled to substantial weight. The Court concludes that there was no reasonable prospect for an appreciation in the value of the partnership herds especially in light of plaintiff's overestimating the anticipated sales prices in his projections. The Court also finds that the financial projections were unreasonably optimistic in their projection of partnership prospects. The failure to include any assumptions in the herd growth charts for RCP II and RCP III, other than projecting a five per cent death loss for all calves born, and RCP Ltd., other than projecting a ten per cent death loss for the first generation of calves and a five per cent for subsequent generations, was unreasonable. The financial projections for the partnerships used unrealistically high prices that were not representative of the Simmental market in 1982 and full blood prices even though plaintiff and Rhine knew that the partnerships would have some purebred and not full blood animals in the herds. Consequently, the Court concludes that RCP Ltd., RCP II and RCP III were not formed primarily with economic profit at the partnership level. Furthermore, the Court concludes that the method in which the herds for RCP Ltd. and RCP II were sold and the sales prices received for these herds indicate that the partnerships were not operated in a manner consistent with the intent to make an economic profit. The Court further concludes that the failure to present evidence showing that the RCP III cattle herd was sold in a dispersal sale indicates that the partnership was not operated consistent with an intent to make an economic profit.

18. During the years of the partnerships' existence, all three partnerships failed to earn net income in any of the years in which they were in operation.

19. Having examined all the relevant factors, the Court finds that economic profit at the partnership level was not the primary or the actual reason for the formation and operation of RCP Ltd. The Court finds that RCP Ltd. was not formed primarily with the intent of economic profit at the partnership level, inasmuch as the financial projections for the partnership failed to include minimal assumptions for death losses and culling and used price projections that were unrealistically high and not representative of the actual Simmental market. The notice of Final Partnership Administrative Adjustment issued to RCP Ltd. on December 28, 1987 was proper and correct in all respects. All deductions claimed on RCP Ltd.'s 1982 Federal Partnership Tax Return were properly disallowed. None of the property purchased by RCP Ltd. in carrying on its operations qualified for investment tax credit treatment.

20. Having examined all the relevant factors, the Court finds that economic profit at the partnership level was not the primary or the actual reason for the formation and operation of RCP II. The Court finds that RCP II was not formed primarily with the intent of economic profit at the partnership level, inasmuch as the financial projections for the partnership failed to include minimal assumptions for death losses and culling and used price projections that were unrealistically high and not representative of the actual Simmental mar-

ket. The notice of Final Partnership Administrative Adjustment issued to RCP II on December 28, 1987 was proper and correct in all respects. All deductions claimed on RCP II's 1983 and 1984 Federal Partnership Tax Returns were properly disallowed. None of the property purchased by RCP II in carrying on its operations qualified for investment tax credit treatment.

21. Having examined all the relevant factors, the Court finds that economic profit at the partnership level was not the primary or the actual reason for the formation and operation of RCP III. The Court further finds that RCP III was not formed with the intent of economic profit at the partnership level inasmuch as the financial projections for the partnership failed to include minimal assumptions for death losses and culling and used price projections that were unrealistically high and not representative of the actual Simmental market. The notice of Final Partnership Administrative Adjustment issued to RCP III on December 28, 1987 was proper and correct in all respects. All deductions claimed on RCP III's 1984 Federal Partnership Tax Return were properly disallowed. None of the property purchased by RCP III in carrying on its operations qualified for investment tax credit treatment.

### JUDGMENT

Findings of fact and conclusions of law dated this day are hereby incorporated into and made a part of this judgment.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that plaintiff recover nothing from defendant.